<hr/>

[No. 12828.   Department One.   February 9, 1916.]

# F. W. HAVERLAND, *Plaintiff and Appellant*, v. THADDEUS S. LANE *et al.*, *Defendants and Appellants.*[1]

FRAUD—PURCHASE OF STOCK—DECEIT AS TO BUYER. In an action for fraud in the sale of corporate stock, concealment of the fact that the stock was bought for the account of an undisclosed buyer is immaterial, where that fact made no difference to the sellers, who were concerned only in getting a satisfactory price.

SAME—PURCHASE OF STOCK—DECEIT AS TO RECEIVERSHIP. Fraud in the purchase of corporate stock cannot be predicated upon the representations that, unless the stock was sold to defendant, the company would be put in the hands of a receiver, where it appears that the company was insolvent or about to become so, and subject to a receivership unless the stock was secured by those who could lend it a new credit.

CORPORATIONS—SALE OF STOCK—TO OFFICER—FRAUD—DUTY OF PURCHASER—DISCLOSURE OF MARKET. Upon the purchase of corporate stock by another stockholder who was an officer in the company, the latter is not bound to disclose his market or reveal a contract that was the result of a personal venture, if the sale was not for the benefit of the corporation.

SAME—PURCHASE OF STOCK—FRAUD—EVIDENCE—SUFFICIENCY. In such a case, damages for the misrepresentations cannot be claimed by sellers of the stock who had opportunity to investigate the books of the company and received their own price, which was about its actual value and in advance of the market price, if it had a market value, and the parties dealt at arm's length.

Cross-appeals from a judgment of the superior court for Spokane county, Blake, J., entered January 9, 1915, upon

[1] Reported in 154 Pac. 1118.

the verdict of a jury rendered in favor of the plaintiffs, in an action for fraud. Reversed on defendant's appeal.

*Danson, Williams & Danson* (*George D. Lantz*, of counsel), for plaintiff.

*Post, Avery & Higgins*, for defendants.

CHADWICK, J.—The plaintiff and his assignors, whom we shall hereafter refer to as the plaintiffs, were stockholders in a telephone company having lines in northern Idaho and running into Spokane, Washington. We shall call it the Limited Company.

The defendant T. S. Lane, whom we shall hereafter refer to as the defendant, was interested as an officer and stockholder in several independent telephone companies in the state of Montana, and in the Home Telephone Company in the city of Spokane, Washington. These were known locally as the "Independents."

In order to secure a line into the city of Spokane, the Independents negotiated for the purchase of the Limited Company. At the time, there was a certain holding company organized under the laws of the state of Montana, known as the Interstate Consolidated Telephone Company. We shall call it the Consolidated Company. This company held the stock of all the independent companies. After negotiating for some time, the Limited Company was sold to the Consolidated Company. In consideration of the transfer of the stock of the Limited Company, the Consolidated Company issued shares in the Consolidated Company to plaintiffs at the rate of one and one-half to one. As a matter of special inducement to those in authority, plaintiff, Haverland, was given a bonus amounting to 550 shares of a par value of $55,000.

The Limited Company was transferred to the Consolidated Company in 1910. In 1911, the independent companies were not prospering. Not more than one or two of them were paying expenses or interest upon their bonds. There were no

, earnings for distribution or to pay dividends on the stock. In the fall of 1911, the Consolidated Company had outstanding obligations amounting to approximately $1,200,000. It is likely that its assets, liberally considered, did not exceed $400,000. However that may be, there can be no doubt that, in the fall of 1911, the Consolidated Company was in a state of no more than tolerant solvency. It was borrowing money to meet expenses and interest charges. Its stock had no tangible or market value. It may have had some speculative value, but there was not even a hope of a fixed fair value on the market.

At this time defendant and another by the name of Mac-Ginniss, who was interested in the independent telephone companies in the state of Montana, went to New York and sought to finance the Consolidated Company. They secured a loan which met temporary needs, but it was apparent that the relief was at best for a short time only, and some further relief would have to be found. Returning from New York, defendant and MacGinniss went to Denver, where they undertook to interest other parties. Nothing definite was decided at the time. In February, 1912, they returned to Denver and the matter was again taken up with Mr. Smith, who was general counsel for the Mountain States Telephone Company, Mr. Hamlin, assistant to the president, and Mr. Field, first vice president of the same company and its active manager. Credit to the Consolidated Company was refused, but it was agreed that a company to be known as the Corporation Securities and Investment Company should be created. It was organized by Mr. Smith through the instrumentality of clerks and employees in his office. We shall refer to it as the Securities Company. After some further negotiations, the Securities Company made and delivered to MacGinnis a writing, wherein it agreed to take 17,555 shares, which would carry a control of the company, at $80 per share, and it was further agreed that MacGinniss would undertake to deliver within ninety days 6,143 shares of the stock, for which the

Securities Company agreed to pay seventy per cent of its par value. The 17,555 shares were delivered promptly. Some of the stock was held in the city of Spokane, the plaintiffs being residents of that city.

The book value of the Consolidated stock at the time, and for a long time thereafter, and possibly at the present time, so far as the record shows, was about $13 a share. It was occasionally sold on the market in Spokane through the brokers who were members of the stock exchange, an institution which has been maintained for many years, for prices ranging from $12 to $20.

Defendant, who was president of the Consolidated Company, caused a letter to be written to plaintiffs on the 16th day of August, 1912, demanding that they return to the Consolidated Company certain stock and preferred certificates which they had caused to be issued to themselves when in control of the Limited Company and which seem to have been issued without any consideration moving to the company. Plaintiff and Phelps referred the matter to Mr. Williams, one of the plaintiffs' assignors, who had a slight holding of stock and who had been their counsel in another matter, and it was his judgment, as well as their own, that defendant had caused the letter to be written in order to coerce a sale of their consolidated stock. Defendant disclaims this motive, but however that may be, the fact is that, through the instrumentality of these letters, the parties were brought in personal contact. They could not agree on the price for the stock, defendant insisting that it was worth $20, which was the prevailing price among brokers, and plaintiffs insisting that it ought to be worth more money. It was finally agreed that defendant would pay, not for the stock but as a bonus, enough to make a net return of $25 per share. Mr. Williams, by demurring longer than the rest, received $31 per share. Defendant claims to have paid this price, as he paid $70 for certain stock held by the officers of the Fidelity National Bank, for the reason that it was his intention to make every

stockholder whole, that is, to pay them all that they had put into the stock. Plaintiffs knew, or had heard enough to lead them to the information, that the Fidelity people had received $70 for their stock. The stock was indorsed in blank and sent with a draft attached for the purchase price to MacGinniss at Butte, Montana, who paid the drafts and cancelled the stock.

In some suit brought in 1914 by the government against the Bell Telephone Company, of which the Mountain States Company and the Securities Company were subsidiary, it was developed that the stock which defendant had purchased had been turned over to the Securities Company by MacGinnis at $70 and $80 a share. This being published in the newspaper report of the proceedings, Mr. Phelps and Mr. Williams assigned their right of action to Mr. Haverland, who began this suit to recover from the defendant the difference between the price paid to them and the price which the Securities Company paid to MacGinniss for the stock. They claimed, first, that, although the stock had no tangible or market value above $20 a share, or no book value beyond $12 or $13 a share, there was a value, in virtue of the contract, of $80 a share; and second, because of defendant's relation to the Consolidated Company and to its stockholders, he was under a legal duty to disclose the fact that he was selling the stock at $80 per share to the parties in interest that they might participate in the sale to the Securities Company. They allege active fraud and deceit in that they had no present intention of selling, that they were not under the necessity of selling, and that they would not have sold but for certain representations which were false—that is, that the Consolidated Company was in a state of insolvency and that, if the sale was not made, the company would be put in the hands of a receiver; and that defendant wrongfully concealed and denied the fact that his purchase was made in the interest of the Bell Telephone System. The case was tried by the court with a jury. At the close of the plaintiffs' case,

defendant interposed a motion for a directed verdict. The motion being denied, was renewed when all the evidence was in, and again being denied, was later renewed by way of a motion *non obstante veredicto*. The court, in passing upon the motion, held as follows:

"As I read the complaint, there are four separate allegations of fraud. The first is that with respect to the book value of the stock being $13 a share. I think that this is immaterial, but if it is not immaterial, the plaintiffs had no right to rely upon the representations for the reason that they had an opportunity to examine the books and did examine certain of the books, and if they failed to examine those books which would show what the book value was, it is their own fault that they were misled. The second is with respect to the insolvency of the Interstate Consolidated. I think that these representations are immaterial so far as they concern those persons to whom the indebtedness was due, but I think that there is a question of fact as to whether or not the corporation was in fact insolvent on the 30th day of September, 1912, and I think it is also a question of fact, as to whether or not there was any danger of a receivership at that time, and the representations in this respect are, I think, a question for the jury. The third representation is that the Bell interests were not concerned in the deal, had no interest in buying up the stock. I think that this is a material representation and if relied upon by the plaintiffs, the question is for the jury to say what their damage is by reason of their misrepresentation. And, fourth, the representation as to the defendant Lane not being interested in the deal. I think that this is immaterial, but as to representations two and three I think they should be submitted to the jury upon proper instructions. I will say, though, gentlemen, that with respect to the representation about the Bell interests not being interested, that it seems to me it is clear that the plaintiff Haverland did not rely upon that, and there is some doubt in my mind as to whether Phelps did or not. So far as Haverland is concerned, it seems to me that his testimony is clear that he did not rely upon it, that the matter that induced him to sell was the representation with respect to the immediate danger of a receivership."

The jury returned a verdict for a part of the amounts claimed by plaintiffs. Both sides have appealed.

After a patient examination of the record, we think that the holding of the court, in so far as it goes to the facts of the case, is well sustained, with the exception of his holding that there was a question of fact as to whether or not the company was insolvent on the 30th day of September, 1912, that being the day upon which the plaintiff sold his stock. We find no testimony that would warrant a holding that the financial situation of the Consolidated Company was any better on September 30th, 1912, than it was in the preceding year, for it will be remembered that the amount paid by the Securities Company was paid to MacGinniss and did not become a part of the assets or available funds of the Consolidated Company.

Whether there was any issue to submit to the jury as to other questions discussed by the court is a matter of law rather than of fact. They depend upon the legal propositions submitted by the plaintiffs—that is, whether there was a value to the stock which plaintiff was entitled to receive, and whether defendant bore a fiduciary relation to the plaintiff and was bound to disclose the fact that the Securities Company had been organized and had entered into the contract for the purpose of bringing the property into the Bell system, and further, whether, these things being true, a concealment of these facts was such a fraud as to warrant a recovery for the amount claimed.

The parties cite a number of cases. We shall refer to a few of them, but it can hardly be said that any one of them is directly in point. Cases sounding in fraud are valueless except in so far as they hold to an established principle, for there, more frequently than in any other branch of the law, do we find the facts to vary. No two cases have the same setting.

We shall spend no time in discussing the contention that the concealment of the fact that the stock was bought for

the interest, if not for the account of, the Bell company was a deceit warranting a recovery. One of the plaintiffs admits that it made no difference to him who the actual buyer was, and the others so testify that the only fair inference to be drawn from the testimony is that they, too, had no interest in the purchaser. Their only concern was to get a satisfactory price. To overturn a consummated sale because a vendor sold indirectly at his own price to one to whom he would not have sold directly would be to hang the law upon a thread so slender that it would not bear its own weight. Whether it was the duty of defendant to admit the existence and the nature of the contract with the Securities Company will be discussed later.

Whether the representation that, unless defendant secured the outstanding stock in the Consolidated Company, it would be put in the hands of a receiver is such a deceit as the law will call a fraud and permit a recovery of damage, is a more material question. Its solution depends upon an inquiry as to the relations of the parties, one to the other, and the financial situation of the company.

We cannot understand how a sale of stock by plaintiffs to defendant would have any bearing upon the question of a receivership. A sale of stock by one stockholder to another cannot affect the financial standing of the company in any degree. It is a transaction that was purely personal to the parties. Plaintiff had the advice of a skilled lawyer who had a personal interest in the transaction. Undoubtedly the company was subject to a receivership, for it was in an insolvent condition. There was no deception in the representation that the company would be thrown or have to go into a receivership unless the stock was secured by others who were financially able to lend it a new credit or to reorganize it with a new capital. A similar statement was relied on as a basis of fraud and coercion in *Steinfeld v. Nielsen*, 15 Ariz. 424, 139 Pac. 879. Of it Judge Ross said:

"If there was fraud or coercion, it consisted in that one act [closing down a mine], emphasized by the statement of Steinfeld to Nielsen that, if he did not take the offer of Steinfeld, he would get nothing for his stock. This last statement, construed under the condition in which it was made, was not necessarily a threat, for it was a fact that the corporation was largely indebted and liable to be sued and its assets taken by creditors; and it was without means to meet the payments on its optional contract to purchase the mines, and a failure to make such payments subjected its principal asset—the mines—to be forfeited as well, also, as all previous payments."

Chief Justice Franklin, in his concurring opinion, held:

"From a fair consideration of the evidence, I am unable but to conclude that the only means whereby the stock would become of any value was by a sale of the mines of the corporation consolidated with the adjoining mines acquired by Steinfeld with his own funds."

In that case there had been an actual enhancement of the value of the stock. The authorities are collected in the *Steinfeld* case, *Perry v. Pearson*, 135 Ill. 218, 25 N. E. 636, being especially instructive.

Plaintiffs knew, or should have known, that no one would purchase unless his object was to prevent a receivership, and apparently resting under such knowledge, were content to turn their backs upon the company for two years or more. They are also bound to a knowledge that the object of the sale as disclosed to them had been accomplished. Furthermore, they knew, or had the means of ascertaining, the financial condition of the Consolidated Company. They had access to its books, and actually made an examination to the extent desired without let or hindrance. They asked for nothing that they did not receive. They knew that company had not paid dividends and that there was no prospect of a dividend, and they knew if the company kept on borrowing money to meet expenses and interest it would inevitably result in a receivership. They sold knowing that the object of the de-

fendant was to prevent a receivership, and they cannot now complain that his statement was deceitful because there was no receivership. This is so for the very simple reason that the law charges them with a knowledge that a sale by one stockholder to another would not of itself create any new source of credit, increase the assets, or invite the intervention of a surety; and that the most probable consequence of gathering in the stock of an insolvent corporation would be to put it in the control of those who might be willing to finance it or to reorganize it if they were in control of it.

But it is said there was no danger of a receivership. To so hold we would have to say that the effect of the MacGinniss contract was to make the company solvent. Just how it can be so held is not made clear by counsel. The parties who bought the stock paid above the market, but that was their own concern. The sale to the Securities Company did not add a dollar to the assets of the Consolidated Company. A purchase of stock at a fancy price for the purpose of gaining control of a corporation will not fix a market price. 2 Cook, Corporations (7th ed.), § 581.

Neither does the testimony show that such market price as the stock of the Consolidated Company had was in any way enhanced. There is nothing to show that it became suddenly more valuable. Indeed, so far as the record shows, there was nothing to excite the interest of the plaintiffs until the sale of the stock to the Securities Company was disclosed in the government suit. It would seem, therefore, upon principle, that the representation that the company would be put into the hands of a receiver unless plaintiffs sold their stock would not be actionable unless it involved an actual misrepresentation as to the value of the stock, or possibly a showing that the stock became more valuable because of existing facts which the vendee, being an officer of the company, was bound to disclose. In any event, if plaintiffs' theory be sound, they, having knowledge that the Consolidated Company did not go into the hands of a receiver, should have

been diligent in the assertion of their rights. We do not comprehend why they should sell their stock under a representation that it would prevent a receivership and afterwards insist that the representation was deceitful, relying upon the fact that the very thing that was in the minds of the parties came about.

Passing these questions, it remains only to inquire: (1) Whether there was a market to which plaintiffs were entitled; and (2) if so, was it the duty of defendant to disclose it, either (a) because he was an officer of the Consolidated Company, or (b) because it was his duty to disclose the market and the terms of his contract when asked if the sale was for the benefit of the Bell Company.

These several questions may be best discussed in a general way. It must be borne in mind that the transaction was a sale of stock from one stockholder to another, the purchaser being an officer of the company. Was there a legal duty upon the defendant to disclose his market? The duty of a stockholder, he being an officer, when purchasing stock from another stockholder, has been defined by this court in *O'Neile v. Ternes*, 32 Wash. 528, 73 Pac. 692. The court adopted the text of 21 Am. & Eng. Ency. Law (2d ed.), p. 898:

"The doctrine that officers and directors are trustees of the stockholders applies only in respect to their acts relating to the property or business of the corporation. It does not extend to their private dealings with stockholders or others, though in such dealings they take advantage of knowledge gained through their official position."

This is the holding of all the courts. Cook, Corporations (7th ed.), § 320; Beach, Corporations, §§ 246, 614.

It would seem, then, if we grant that defendant was bound to disclose anything that might affect the corporation, that he was under no duty to reveal a contract and a market that was the result of a personal venture. There is nothing in the law that will prevent a stockholder, although he be an officer, from dealing in the shares of a corporation. He may find a

market and buy stock to fill it. If his purchaser is willing to pay more than the stock is worth to get control of the company, or for any ulterior purpose, it is of no concern to the seller.

If the purchaser is under personal contract to deliver to a third party, he is not bound to disclose his market. If it is for the benefit of the corporation, he is. In this distinction is to be found the dividing line between actionable and nonactionable fraud and deceit. In all of the cases relied on by counsel will be found a duty, whether it rest in agency, partnership or joint venture. The parties were not dealing at arm's length, but the one was bound to act for the other, or for all having a like interest. The only case to which we shall refer is *Strong v. Repide*, 213 U. S. 419. It is said by counsel to be parallel in facts and conclusive of this case, but we do not so regard it.

In that case, there was an inactive corporation. It was no more than a name. It owned large bodies of land. "The company had no other property of any substantial value than these lands. They were its one valuable asset." We take it from the report of the case that the lands were not kept up in any way by the owners, but were held pending a possible purchase by the United States government. There was nothing left of the corporation when the sale was concluded. The parties were, to all intents and purposes, partners with interests proportionate to their holdings of stock. The principal owner, because of his large controlling interest, had been consulted and knew that the lands might be sold for a price to be agreed upon; that a large sum of money had already been offered by the government. He did not go to the complaining stockholder or to her agent, although he knew him. He had an office in the same building. He purchased the stock through the intervention of a relative, who in turn employed a broker to approach the agent who had the stock in his hands. Every effort was made to conceal the prospective sale of the lands, and the immediate purchaser of the stock.

"Perfect silence was kept." Suspicion was anticipated and avoided. "The agent of the plaintiff had no knowledge or suspicion that the defendant was the one seeking to purchase the shares." The value of the stock, by reason of the sale of the lands, increased from $16,000 to $76,256 in two months and a half.

In the case at bar, the sale was entirely independent of the corporation. It did not involve its tangible assets in any way or affect their value. The parties dealt face to face. Plaintiffs knew that defendant had been purchasing stock and wanted theirs. They were suspicious of him and voiced their suspicions. They had access to the books of the company. They knew that the company was subject to a receivership if it passed its interest payments. They no doubt entertained a natural belief that others were seeking the property for their own advantage and benefit. Taking their suspicions at their full worth, they amounted to no more than this: they were apprehensive that the sale was for the benefit of some one with means to rejuvenate the Consolidated Company. But that was not enough to defeat a sale if they got a fair price. They accordingly capitalized their suspicions in money and took $5 per share—in one instance $11—above the price at which it was selling among the brokers in Spokane. Then, too, this case is to be distinguished from the *Strong* case, in that the record shows no marked increase in the market value of the stock.

In discussing the *Strong* case, it is not out of place to refer to one of the contentions made by plaintiffs; that is, if they had been informed of the contract with the Securities Company they might have sold to that company. We do not so read the record. It is true that Smith said they were willing to take the stock from any one who had it, but he also said that they would not have purchased it from any one except through MacGinniss. It is evident to us that this must be true, for the whole negotiations between the Securities Company and MacGinniss and the defendant were kept secret

until they were disclosed in the government suit. At that time the transactions between the parties had ended. The Consolidated Company and its affairs had not attracted the attention of plaintiffs or any one until they learned through the newspapers that, although they sold their stock at above its actual worth, granting that it had a market value, they had not been privileged to share in the exploitation of the Bell Company by its own agents and officers of its subsidiary, the Mountain States Telephone Company.

In the case at bar, the defendant was not an agent but a buyer. He bought on the market at the seller's price. The parties dealt at arm's length. The law will presume that defendant bought for an advantage, and under the authority of our own decision in *O'Neile v. Ternes, supra*, he was not bound to disclose his market and is consequently entitled to the advantage of his trade. If MacGinniss had not delivered under the contract, or the Bell Company had compelled a restitution from its agents, the loss would have fallen upon him and him alone. It is insisted that there is no testimony to sustain a finding that defendant profited by the deal. We think there is no direct evidence of this fact.

Plaintiffs, as stockholders, have lost nothing that the law will compensate in damages. They have no cause of action. The only party legally injured, in so far as the record goes, is the Bell Telephone Company, which seems to have suffered by reason of the activities of its agents and servants in their own behalf and at its expense. It is not now complaining.

Reversed on the appeal of defendant, and remanded with directions to dismiss.

MORRIS, C. J., FULLERTON, ELLIS, and MOUNT, JJ., concur.