**WOOTTEN v. WOOTTEN et al. (two cases).**
Nos. 3120, 3121.

Circuit Court of Appeals, Tenth Circuit.
Aug. 27, 1945.

Harry Hammerly, of Chickasha, Okl. (Seth & Montgomery, of Santa Fe, N. M., on the brief), for appellants.

H. A. Kiker, of Santa Fe, N. M., for appellees.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

These are actions to establish constructive trusts in certain shares of stock of the Red River Ranch, Inc. The court below held that the complaints failed to state claims upon which relief could be granted, and dismissed the actions.

The facts alleged in the complaints are these:

On or about July 30, 1936, R. K. Wootten was the owner of certain ranch properties located in Mora, Colfax, and Harding Counties, New Mexico, consisting of 10,000 acres of deeded land, 46,000 acres of leased land, 4,000 acres of land purchased under contract from the State of New Mexico, 1300 head of ranch cattle, and horses, milk cows, and ranch equipment. On that date, R. K. Wootten sold and conveyed to his brother, John B. Wootten, an undivided one-half interest in the real estate and other ranch properties, and thereafter, until the death of R. K. Wootten, he and John B. Wootten were partners in the ownership, management, and operation of the ranch.

On July 30, 1936, R. K. Wootten and John B. Wootten entered into a contract with W. R. Ferguson for the management and operation of the ranch properties for a term of six years. The contract recited that the ranch properties, other than cattle, had a value of $88,000, and that the cattle had a value of $57,587.50. It provided that Ferguson would manage and superintend the ranch and its operations for a period of six years from January 1, 1936; that the Woottens would pay him a salary of $100 per month and provide funds for the economical operation of the ranch; that the net profits or losses sustained in the conduct and operation of the ranch, excluding increases in the value of the lands, should be determined annually; that, in the event the net operating profit for the full term of six years should equal 100 per cent of the total investment during such period, including the fixed value of the lands and leases, Ferguson should be entitled to an undivided one-third interest in the ranch lands, leases, livestock, and equipment, and that such interest, at the end of six years, would be transferred to Ferguson; and that, in the event the net operating profit should not equal 100 per cent, an interest in the ranch properties on the basis of the net profits earned would be transferred to Ferguson at the end of the six-year period.

R. K. Wootten died testate, January 2, 1938. John B. Wootten was the executor named in the will and duly qualified as such and has continued to act as such executor. Under the will, one-tenth of the ranch properties were devised and bequeathed to Vendla E. Wootten, widow of R. K. Wootten, deceased, and one-tenth to each of the four children of R. K. Wootten, deceased. The will provided that each of the shares of the four children should vest in John B. Wootten, as trustee. The will gave the executor power and authority to manage, control, sell, transfer, and convey any and all property of the estate and to invest and reinvest any and all money coming into his possession in such securities and upon such terms and conditions as he might, in the exercise of his judgment and discretion, determine.

During the continuance of the Ferguson contract, it became necessary, from time to time, to purchase supplies, make advancements, purchase additional deeded land, and finance the operation of the ranch properties. The funds therefor were contributed equally by R. K. Wootten during his lifetime, and thereafter by the executor of his estate, and by John B. Wootten.

After the death of R. K. Wootten, John B. Wootten formulated a plan to create a corporation under the laws of New Mexico and to transfer all of the ranch properties to such corporation. In December, 1939, John B. Wootten, acting for himself individually and as executor of the estate of R. K. Wootten, deceased, and as trustee for the children, Vendla E. Wootten, and Ferguson entered into a contract whereby they agreed to create such corporation and to transfer the ranch properties to the corporation in exchange for 2500 shares of the corporate stock of the par value of $100 per share; to deliver two-thirds of such stock to John B. Wootten individually and as trustee for the children, and to Vendla E. Wootten, and to retain, as treasury stock for the protection of Ferguson, under the contract, one-third of the authorized capital stock, and at the end of the six-year period, to issue to Ferguson the one-third of the shares retained in the treasury or such portion thereof as he might be entitled to.

The corporation was duly created under the name of Red River Ranch, Inc. Six hundred and ten shares of the capital stock were issued to John B. Wootten individually, 122 shares to Vendla E. Wootten, and 488 shares to John B. Wootten, as trustee for the children. The remaining one-third

of the stock, except one share issued to Ferguson, was held in the treasury. At the expiration of the six-year period, a controversy arose between John B. Wootten and Ferguson as to the interest in the ranch properties that Ferguson was entitled to receive under the contract. Ferguson brought an action in the District Court of the Eighth Judicial District of New Mexico against the Red River Ranch, Inc., and others. On December 4, 1942, a decree was entered in that case. It adjudged that Vendla E. Wootten was entitled to 126 shares of the corporate stock; that John B. Wootten, as trustee for the four children, was entitled to 504 shares of such stock; that John B. Wootten individually was entitled to 630 shares of such stock; and that Ferguson was entitled to 570 shares of such stock.

Following the entry of such decree, John B. Wootten discontinued the services and employment of Ferguson and took over the sole and exclusive operation and management of the corporation and its ranch properties.

In January, 1944, John B. Wootten began negotiations with Ferguson to purchase all of the latter's corporate stock. Ferguson had disposed of 34 shares of the stock issued to him. John B. Wootten consummated the purchase of the remaining 536 shares of stock held by Ferguson for $87.50 per share. At the time of such purchase, such stock had an actual value of $175 per share. John B. Wootten, as trustee of the trust estates, had sufficient funds in his hands to purchase two-fifths of such stock for the benefit of the children.

Carl Eklund Wootten, one of the children, brought an action in which he alleged the foregoing facts and sought a decree adjudging that John B. Wootten held 53.6 shares of the 536 shares purchased from Ferguson, as trustee for Carl Eklund Wootten. Each of the other children brought a like action.

Vendla E. Wootten brought an action against John B. Wootten in which she alleged the foregoing facts and further alleged that John B. Wootten, as executor of the estate of R. K. Wootten, deceased, and as president and sole manager, and in full control of the ranch properties, was acting in a fiduciary capacity with respect to Vendla E. Wootten when he purchased the Ferguson stock, and sought a decree adjudging that John B. Wootten held 53.6 shares of such stock as trustee for Vendla E. Wootten.

No. 3120 is an appeal from the judgment entered in the action brought by Carl Eklund Wootten. No. 3121 is an appeal from the judgment entered in the action brought by Vendla E. Wootten.

In this drama of real life, John B. Wootten was the principal actor. At its inception, he owned individually one-half of the ranch properties; the widow and children of his deceased brother owned the beneficial interest in the remaining one-half thereof; and Ferguson, under his contract, had a contingent interest which might ripen into an ownership of one-third of such properties. John B. Wootten, as executor under the will, occupied a fiduciary relationship to Vendla E. Wootten, and, as trustee under such will, a fiduciary relationship to the children. Ferguson was the active manager of the ranch properties. John B. Wootten, as an individual, had a voice equal to, but not greater than, that of the other parties to the joint adventure. John B. Wootten first brought about the formation of the corporation, the transfer of the ranch properties to it, and the issuance of two-thirds of the shares of stock in the corporation to himself individually and as trustee, and to Vendla E. Wootten, in proportion to their respective interests in the ranch properties. At that stage the stock held by John B. Wootten individually did not give him control of the corporation. He could only dominate the corporation by joining the voting power of his individual stock and the stock held by him as trustee. By acquiring the Ferguson stock, he passed from a position where his individual interest was equal to the interests of the widow and children to the dominating position of a majority stockholder. The plan under which he organized the corporation, conveyed the ranch properties to it, and ultimately acquired a controlling interest in the corporation was all carried out during the time when he occupied such fiduciary relationships.

Many forms of conduct regarded as permissible for those acting at arm's length are forbidden to those bound by fiduciary ties. The standards of conduct for a trustee rise far above the ordinary morals of the market place. Not honesty alone, but a punctilio of honor the most sensitive is the standard of behavior required of a trustee. He must completely

efface self-interest. His loyalty and devotion to his trust must be unstinted. Its well-being must always be his first consideration. These principles are inveterate and unbending.[1]

A trustee must not compete with his beneficiary in the acquisition of property. The principle is not limited to cases where the fiduciary acquires property entrusted to him, nor to cases where the fiduciary competes with the beneficiary in the purchase of property which the trustee has undertaken to purchase for the beneficiary. Even though the interest purchased by the fiduciary for himself is not property of the beneficiary entrusted to the fiduciary, nor property which the fiduciary has undertaken to purchase for the beneficiary, the principle applies if the property purchased by the fiduciary for himself is so connected with the trust property or the scope of his duties as fiduciary, that it is improper for him to purchase it for himself.[2]

It was to the advantage of John B. Wootten to secure a majority interest in the stock of the corporation, which gave him control. It was also to the disadvantage of the widow and children because it placed them in the position of minority stockholders. Because as an individual and fiduciary John B. Wootten was in control of the corporation and its management, he was able to purchase the Ferguson stock at a very advantageous price. Knowledge that came to him in his capacity as fiduciary was used to his individual advantage. It is true that he might have had that knowledge had he not been trustee and executor, but had he not been trustee and executor, a disinterested person would have been serving in those capacities, who would have had the knowledge from which John B. Wootten profited and who could have protected the interests of the widow and children.

The motions to dismiss admitted all the facts well pleaded[3] and all facts that can be reasonably inferred from the facts alleged.[4]

It is our opinion that under the facts well pleaded and the facts reasonably to be inferred therefrom, John B. Wootten, in acquiring all of the 536 shares of the Ferguson stock solely for himself individually, failed to measure up to those high standards of conduct which courts of equity have laid down as a measure of behavior required of a fiduciary and that the motions to dismiss should have been overruled.

It may be on a hearing, John B. Wootten can satisfy the chancellor that, in failing to purchase half of such stock for the estate and for the trusts, he acted in good faith and in the exercise of a wise discretion.[5] That issue, however, we think should be resolved after a full and searching inquiry into the facts.

The judgments are reversed and the causes remanded with instructions to overrule the motions to dismiss.

HUXMAN, Circuit Judge (dissenting).

The only question in these cases is whether the facts well pleaded in the complaints which stand admitted by the motion to dismiss make a case against the appellee. There is no allegation that appellee acted fraudulently or in bad faith. The allegation that he was legally and equitably bound to purchase a ratable portion of this stock for the widow or for the trusts does not support a charge of fraud or bad faith. One might in the best of faith fail to do something which as a matter of law or equity he was bound to do.

What, then, are the facts from which this question must be answered? Briefly, they are these: The widow and the trusts owned and held one-third, plus twenty, of the shares of the stock of the Red River Ranch Corporation. The executor and the trustee owned and held individually a like amount, and Ferguson owned and held 570 shares. Ferguson thereafter sold 34 of his shares to

---

[1] Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546, 62 A.L.R. 1; Johnston v. Loose, 201 Mich. 259, 167 N.W. 1021, 1023; Ball v. Hopkins, 268 Mass. 260, 167 N.E. 338, 341.

[2] Scott on Trusts, Vol. 3, p. 2424, § 504; Id., Vol. 3, p. 2413, § 499; Johnston v. Loose, 201 Mich. 259, 167 N.W. 1021, 1022–1024; In re Robbins' Estate, 94 Minn. 433, 103 N.W. 217, 110 Am.St.Rep. 375; Pine v. White, 175 Mass. 585, 56 N.E. 967.

[3] Gannaway v. Standard Acc. Ins. Co. of Detroit, 10 Cir., 85 F.2d 144, 145; Rishel v. Pacific Mut. Life Ins. Co. of California, 10 Cir., 78 F.2d 881, 886, 131 A.L.R. 414; Blanchar v. City of Casper, 10 Cir., 81 F.2d 452, 453.

[4] Hammond v. Mason and Hamlin Organ Co., 92 U.S. 724, 726, 23 L.Ed. 767; Weeks v. Denver Tramway Corporation, 10 Cir., 108 F.2d 509, 510.

[5] Cf. Pine v. White, 175 Mass. 585, 56 N.E. 967, 968.

outsiders. Thereafter the balance of his stock was for sale, and he sold this to John B. Wootten individually for $87.50 per share. The complaints allege that this stock was worth $175.00 per share. In addition to these facts, the complaints allege that John B. Wootten was legally, equitably and morally bound to buy a ratable portion of this stock for the widow and for the trusts. This allegation must be disregarded in seeking the correct answer, because it is a mere conclusion of law and not a statement of fact. Whether he was legally and equitably bound to do this is a question we must answer, and the answer depends upon the facts which are well pleaded.

I think the situation must be viewed as of the time of the formation of the corporation. What the situation was prior to that goes out of the picture. While by innuendo the complaints seek to ascribe some sinister motives to John B. Wootten in the formation of the corporation, there is no justification for this. Prior to the death of R. K. Wootten, the enterprise was a partnership in the nature of a joint adventure between R. K. Wootten, John B. Wootten, and Ferguson. The death of R. K. Wootten ended this arrangement and made it necessary to perfect some other organization to carry on the common enterprise. The corporation was not only a proper, but also a natural medium for continuing the enterprise. After the stock was issued to the respective parties, they owned it separate and distinct from each other. There was no common, undivided ownership of the property or fiduciary relationship between the respective owners of this stock. The ranch properties no longer belonged to them. They belonged to the corporation. The only community of interest that they had was in the prosperity of the corporation which would be reflected in substantial dividends on the stock which each owned.

### Number 3121

I fail to see where John B. Wootten as executor of the estate was under any duty to the widow to purchase any of this stock for her. The theory upon which she seeks to maintain her action is that as executor of the will, it was the appellee's duty to purchase some of this stock for her, and that as president and sole manager of the corporation he was duty bound to advise her of the value of the stock and of the price at which he had purchased Ferguson's stock and afford her an opportunity to purchase some of it ratably with him.

The ordinary duties of an executor are to marshal the assets of the estate, pay the debts, and make distribution of the balance pursuant to the provisions of the will. Ordinarily he has neither the duty nor the power to make investments during the period of the administration. The will in question contained a provision which authorized the executor to invest "all money" coming into his possession under such terms and conditions as he might determine "in the exercise of his judgment and discretion." It also provided a period of five years for the administration of the estate and at the end thereof directed the executor to distribute the assets to the beneficiaries either in cash or in kind.

The will did not direct the executor to make any investments of cash. Whether any investments of cash were made during the period of the administration was left entirely to the discretion of the executor. He was not bound to make any investment. Certainly the will gave the widow no power to direct him in the management of the estate or the investment of money on hand in the estate during the period of administration.

But, in any event, he could have made no investments after it became his duty to distribute the assets to the beneficiaries. At that time they had the right to demand the estate in cash or in property in kind. The opportunity to purchase this stock arose more than six years after the death of the testator. It seems obvious that the executor was not free to make any investments at that time. Furthermore, the widow's complaint fails to allege that there was any money in the estate belonging to her which could have been invested. Apparently there was none, because she tendered into court her personal funds to give her the stock which she now seeks. Certainly the executor could not be liable for failure to make an investment if there was no money to invest. He was under no duty to invest her personal funds. A complaint which fails to allege that there was money on hand which could have been invested is wholly insufficient on its face to state a cause of action seeking to hold the executor liable for failure to make such investments.

The second ground upon which she seeks to recover is that appellee as sole manager and president of the corporation was duty

bound to advise other stockholders of the prospective sale of the stock, of its true value, of the price at which it could be bought, and required him to afford them an opportunity to participate with him in the purchase thereof.

No case is cited to support this novel contention, and my search has failed to reveal any. A director or managing officer of a corporation is a trustee only in regard to his activities in respect to the business or property of a corporation.[1] There is a line of cases which holds that in some instances a managing officer stands in a trust relationship to a stockholder with whom he is dealing for the purchase of his stock and owes him a duty to make a full disclosure of all relevant facts.[2] But this is not such a case. Ferguson is the only one who could complain about the sale of his stock to John B. Wootten on this ground. Appellee owed no duty to the other stockholders, because of his position as sole managing officer of the corporation, to inform them of the opportunity to purchase this stock or offer them an opportunity to participate in the purchase thereof.

### Number 3120

In this case the beneficiaries of the trusts charge the appellee with failure to live up to that high degree of accountability required of a trustee in the management of a trust estate. Again it is not claimed that he was guilty of fraud or bad faith, neither is it charged that he misused or mismanaged trust funds to the detriment of the trust. The only charge is that he failed to make an investment of trust funds in the Ferguson stock when it was for sale at $87.50 and had an alleged value of $175.00 per share. It is charged that he was legally and equitably bound to purchase a ratable portion of this stock for the trusts.

I am in full record with the statement of the legal principles in the opinion of the majority by which the conduct of the trustee must be gauged. Of course a trustee may not compete with a beneficiary in the acquisition of property. I agree that this principle is not limited to cases where a fiduciary acquires property entrusted to him, nor to cases of competition with regard to property which the trustee has undertaken to purchase for the beneficiary.

It applies, as it should, to all purchases of property by the fiduciary which is so connected with the scope of the trust as to make it improper for him to own it individually. The only question is whether the facts well pleaded, which stand admitted by the motion to dismiss, bring this case within any of the above principles.

The cases upon which the majority rely are not persuasive because they are distinguishable upon the facts. In the Pine case, the trust estate owned an undivided one-half interest in a house and lot. The trustee purchased the other half interest in the property for his sister at $450, when its assessed valuation was $1,800 and its real value, as found by the court, was $1,400. The court points out the obvious advantages of acquiring the entire ownership of property when it could be done at such an advantageous price. The trial court accepted the trustee's explanation and found he had acted in good faith. On appeal, the judgment was affirmed. The appellate court pointed out that ordinarily a trustee is not compelled to make a particular investment. All the appellate court held was that had the trial court held him liable "we should have been *disinclined* to disturb the finding." [3]

In Johnston v. Loose, the guardian of minor wards purchased in his own name and for his own benefit the widow's unadmeasured outstanding dower interest in lands to which his wards held the fee. In In re Robbins' Estate, the attorney for the administrator of an estate purchased the life estate from the husband of the deceased. He acted in good faith and apparently after consultation with the probate court and after being advised by the court that it would be proper for him to purchase the interest. The court, however, held that he stood in a fiduciary relationship to the estate and therefore could not purchase an interest in the property belonging to the estate. In all of the above cases the fiduciary purchased an interest in the specific property belonging to the trust estate. In our case the trust property consisted of a block of 630 shares of stock of a corporation. The trustee did not deal with this property in any way. He bought a separate and distinct block of 536 shares of stock, in no wise

---

[1] O'Neile v. Ternes, 32 Wash. 528, 73 P. 692; Haverland v. Lane, 89 Wash. 557, 154 P. 1118.

[2] Stewart v. Harris, 69 Kan. 498, 77 P. 277, 66 L.R.A. 261, 105 Am.St.Rep. 178; Oliver v. Oliver, 118 Ga. 362, 45 S.E. 232; Bettendorf v. Bettendorf, 190 Iowa 83, 179 N.W. 444.

[3] Emphasis supplied.

connected with the trust other than that it was issued by the same corporation.

The only point made which could in the least challenge the transaction is that the purchase of this stock gave John B. Wootten personal control of the corporation through ownership of a majority of the stock. But without the purchase of this stock he had such control throughout the entire period of the trusts. If he was legally bound to maintain a balance of ownership between himself and the trust estates or prevent them from becoming minority stockholders, he could not have sold his own stock to Ferguson because that would have given him control of the corporation. His management or control of the corporation, whether he was a majority or a minority stockholder, if he used either to the detriment of the corporation and thus caused loss to the stockholders, would charge him with liability. If he did not so use his office or control he would not be liable merely because he held a majority of the stock. His duties as trustee do not require him to so manage the trusts as to give the beneficiaries the legal power to control the corporation or an equal voice with him in the management of the corporation. Failure on his part to secure control of the corporation for the trusts or to maintain for them an equal voice with him in its management would in itself not result in loss to the estates.

Control of the corporation may be a factor to be considered by the trustee in the management of the trust and in deciding whether he should purchase this stock, but it is only one of the many factors. But failure to secure to them control of the corporation by the purchase of this stock or taking control himself by buying it individually is in itself insufficient to make a prima facie case against the trustee. In the end, his primary duty is to so manage the trust property that the greatest possible returns may be earned and so that the corpus will not be impaired by mismanagement.

The administration of a trust of necessity involves the exercise of sound discretion and judgment. These responsibilities rest with the trustee. Neither the beneficiaries nor the courts may exercise these functions or direct the trustee in the exercise thereof. Ordinarily courts will not require the trustee to explain why he did not make a particular investment. His responsibility for acting is much greater than when he fails to act.

The mere fact that the trustee purchased for himself a block of stock in a corporation in no way connected with stock of such corporation in the trust for $87.50 which is worth $175.00 is insufficient to make a prima facie case of fraud, mismanagement, or bad faith on his part in the operation of the trust. Neither is the fact that such purchase gives him a greater voting power than that possessed by the trust or that it gives him a majority of the stock sufficient to require him to justify his management of the trust estate and give an explanation of his refusal for making the particular investment.

For the above reasons, I respectfully dissent.