FINN

v.

EMPIRE TRUST CO. et al.

United States District Court
S. D. New York.
April 15, 1950.

**310**

Lorenz, Finn & Lorenz, by John F. X. Finn, Joseph Lorens, and Norman C. Mendes, New York City, for plaintiff.

McNamara & Seymour, New York City, by U. S. Grant and Charles Green Smith, New York City, for Empire Trust Co., individually and as trustee under Trust Indenture dated April 1, 1928, Newcombe C. Baker, P. Lyndon Dodge, Clinton T. Revere, Charles D. Halsey, George Carmichael, George L. Hackl, Jr., Louis A. Gibbs, Van R. Halsey and Louis L. Allen.

Simpson, Thacher & Bartlett, New York City, by Louis Connick and B. C. Milner, New York City, for Robert Haydock et al.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, by Ralph M. Carson and Edward J. McGratty, New York City, for Ramon O. Williams.

Lord, Day & Lord, New York City, by T. F. Daly, New York City, for Corn Products Refining Co.

Bruce E. Grunden, New York City, for William A. Barber.

BONDY, District Judge.

The plaintiff, as trustee of Childs Company (hereinafter called "Childs"), debtor in reorganization proceedings under Chapter X of the Bankruptcy Act, 11 U. S.C.A. § 501 et seq., seeks to recover damages from defendants on three separately alleged causes of action.

The first cause of action has been brought to recover for losses sustained by Childs, its stockholders and creditors as a result of the acts of defendants in causing the adoption and furtherance of employees' stock purchase plans by the company, allegedly for the sole purpose of promoting their own personal interests and in utter disregard of the rights of Childs, its stockholders and creditors.

The New York Statute of Limitations has been pleaded as a defense in the answers of all the defendants. Plaintiff concedes that the action is barred by the Statute of Limitations unless the "gravamen of the action" is fraud, in which case "The cause of action * * * is not deemed to have accrued until the discovery by the plaintiff, or the person under whom he claims, of the facts constituting the fraud." New York Civil Practice Act, § 48(5).

On August 18, 1928, Tucker, Anthony & Co. and Laird, Bissell & Meeds, partnerships engaged in business as underwriters, brokers and dealers in securities, William A. Barber, general counsel and a

director of Childs, Leroy W. Baldwin, president of Empire Trust Company, a New York banking corporation, and acting for that corporation, and William Childs, president of Childs, entered into a syndicate agreement for the purpose of purchasing, holding and dealing in shares of the common stock of Childs. Tucker, Anthony & Co., Laird, Bissell & Meeds and William Barber were appointed managers of the syndicate and were to acquire not more than 100,000 of the 362,612 shares of Childs outstanding common stock. The shares held by the syndicate were to be voted at all meetings of Childs in such manner as might be determined by a majority of the subscribers. Upon the request of a majority of the subscribers William Childs and Barber undertook to create three vacancies on the board of directors to be filled by persons designated by a majority of the subscribers, and the by-laws of Childs were to be amended to provide for an executive committee of the board of directors which, subject to the direction of the board, should have and exercise all of the powers of the board. The members of the executive committee were to be directors of Childs designated for membership on the committee by a majority of the subscribers of the syndicate. The syndicate, which was to continue for one year, was extended by subsequent agreements to November 18, 1930, at which time it was terminated.

On December 11, 1928, William Childs retired from the syndicate and the participation of the other subscribers was increased to one quarter each.

At the annual stockholders' meeting of Childs on March 7, 1929, there was a proxy fight between William Childs and a group of stockholders on one side, and Barber and a group of stockholders, including all the syndicate participants on the other, which resulted in a victory for the Barber faction. William Childs was ousted from control of Childs and a group of directors nominated by the Barber group was elected. All of the syndicate participants were represented on the newly elected board of directors, which included Barber, Baldwin, Hollyday S. Meeds, Jr., a partner of Laird, Bissell & Meeds, Clement R. Ford, a partner of Tucker, Anthony & Co., and Ramon O. Williams, an employee of Tucker, Anthony & Co.

By November 1, 1929, the syndicate had acquired approximately 92,000 shares of Childs common stock at an average cost of approximately $56 a share. During the remainder of 1929 the syndicate neither bought nor sold any substantial amounts of Childs common stock. Both Tucker, Anthony & Co. and Laird, Bissell & Meeds gave sub-participations in their interests in the syndicate, carrying their sub-participants on margin accounts, but the management and control of the syndicate remained in the hands of the original subscribers. Among the sub-participants of Laird, Bissell & Meeds were a senior partner of the firm, a corporation owned by another partner and his family, and important customers and clients. Among the sub-participants in the interest of Tucker, Anthony & Co. were the wives of three of the partners of the firm and important customers. Empire Trust Company, in addition to its 25% participation in the syndicate, also financed Barber's participation. The collateral held by Empire Trust Company for its loans to Barber, which exceeded $1,200,-000, was a certificate of deposit for $100,000, and Barber's stock itself.

During the latter part of October and the early part of November, 1929, there was a drop in the stock market generally and Childs common stock, which on October 23rd had sold at a high of $75⅜, dropped to a low of $45 on November 12th. This decline threatened considerable loss to the syndicate participants and sub-participants, who had invested in excess of $5,000,000 in the purchase of the stock, and Tucker, Anthony & Co. demanded and received additional margin from its sub-participants. Empire Trust Company was faced with a loss not only on its own investment in the syndicate but also on its loans to Barber, which on November 12th exceeded the amount of

the certificate of deposit and the value of Childs common stock held as collateral by approximately $140,000.

On November 13, 1929, Childs, under the management and control of the syndicate, began to purchase shares of its own common stock in the open market. The charter of Childs authorized it to trade in its own stock, but the minutes of the meetings of the board of directors do not disclose the reason for the purchase of stock at this particular time, nor do they authorize such purchase. The minutes of a meeting of the board held on November 27, 1929 show that the treasurer reported that during October and November, 1929, Childs had purchased some of its own preferred stock and debentures, but do not contain any mention of the approximately 4,300 shares of Childs common stock that had been acquired by the corporation at a cost of over $200,-000 during the month of November, 1929. The minutes state that whereas the "Board is of the opinion that it would be advantageous, both to this corporation and to its employees, to have the employees of the corporation become stockholders therein, and that it would be well for the corporation, if possible, to aid its employees in the purchase of its stock"; it is resolved to appoint a committee with the power "to consider and, in their discretion, to adopt such plan or plans as they may deem proper for the sale by the corporation of shares of the common capital stock of this corporation to its employees and to fix the terms of payment for such shares and the price or prices (which may be greater or less than the cost thereof to the corporation) at which the same shall be sold; and if they adopt any such plan or plans, to take any and all action which may be appropriate to carry the same into effect; and * * * to acquire for the corporation such shares of its issued and outstanding common capital stock as they may deem proper, at such price or prices as they may determine, either for the purpose of carrying out any such plan or plans or in anticipation of the adoption of a plan or plans as herein provided."

Every participant in the syndicate was represented on this stock committee, which consisted of Barber, Baldwin, Ford and Meeds.

A stock purchase plan (hereinafter called "the Plan") was submitted to the employees of Childs on or about December 20, 1929. The Plan enabled the employees to buy Childs common stock at $56 a share, payable in minimum monthly installments of $1.50 over a period of approximately 37 months. Larger payments could be made if desired, but in no event were stock certificates to be delivered to the purchaser until the expiration of one year from the date of the offer. If an employee left the service of the company or failed to make payments at the provided minimum rate his subscription was to be cancelled and settlement made at the option of the company by either or both of the following methods: (1) The total amount of money paid by the subscriber would be returned to him with interest at $4\frac{1}{2}\%$ per annum; or (2) A sufficient number of shares would be sold at the market price at the time of cancellation to complete the amount due on the total subscription and the remainder of the shares would be delivered to the subscriber. All subscriptions had to be made not later than February 1, 1930. If the subscriptions received exceeded the available stock, there was to be a proportional allotment of shares to the subscribers.

The fact that an employees' stock purchase plan had been adopted and that stock had been acquired for the purpose of such plan was disclosed in a statement released to the press and published in the New York Times on December 20, 1929.

With the exception of 4,000 shares, which Childs purchased directly from the syndicate, substantially all of the purchases of stock for Childs were made in the open market. Empire Trust Company was the agent of Childs through which the acquisition of the stock was made. It received the stock from the brokers and it made payment therefor out of funds provided from time to time

by Childs. For these services Empire Trust Company did not make any charge.

By February 4, 1930 Childs had acquired approximately 14,200 shares of its common stock. On that day a letter from the treasurer of Childs informed the syndicate that subscriptions for approximately 18,500 shares had been received from 2,481 employees and that if the syndicate would sell to Childs 4,000 shares at $59 a share this would be sufficient to meet the demand of the employees without raising the cost of the stock to Childs over $55.96 a share. In response to this letter the syndicate on February 17, 1930 sold to Childs 4,000 shares for $236,000 at an average of $59 a share. The market price of Childs at this date was approximately $64 a share. By this time Childs had purchased a total of 18,200 shares for the Plan at a cost of slightly over $1,000,000.

From the commencement of acquisitions of stock for the Plan, purchases therefor represented a considerable proportion of the transactions in Childs common stock on the New York Stock Exchange. Beginning with the third week in November, 1929, and continuing throughout the months in which stock was acquired for the Plan, the price of Childs common stock increased more rapidly from its low point at the end of the second week in November than did any other comparable securities. When acquisitions for the Plan ceased, the fluctuation of the price of Childs stock was similar to that of other comparable securities.

On November 13, 1929, the day that Childs began purchasing its stock, Hollyday S. Meeds, a partner of Laird, Bissell & Meeds, purchased 2,350 shares of stock and two customers of that firm purchased 3,000 shares at $40.25 a share. On November 14, 1929, Empire Trust Company purchased for its own account 5,350 shares of Childs common stock at the same price.

In January and February of 1930, when the purchase of stock for the Plan was drawing to a close, the syndicate sold 16,000 shares for its own account and it gave an option to a potential purchaser for 16,000 additional shares at prices ranging from $62 to $69 a share. During this same period Empire Trust Company sold 3,600 shares for its own account at prices ranging from $61½ to $68 per share, and Hollyday S. Meeds sold 850 shares at prices ranging from $65¾ to $67 a share.

The price of Childs common stock remained fairly steady during the summer months of 1930. In September, however, there was a sharp decline in the price from a high of $58 a share on September 6th to a low of $44½ a share on September 30th. This decline, like that in November, 1929, impaired the investment of the syndicate and endangered the Plan because employees were unlikely to continue paying the subscription price of $56 a share when they could acquire the same stock in the market at $44½. By the beginning of October approximately 15% of the total number of shares subscribed under the Plan had been cancelled and many other subscriptions were in default. At the end of October approximately 25% of the subscriptions were in default or cancelled. An additional 1,300 shares were cancelled during November and December, 1930.

On October 2, 1930, Childs again began purchasing its own common stock. By the end of October 6,300 shares had been purchased. In November 1,500 shares were purchased, and in December 10,500. Although 18,300 shares were purchased at prices ranging from $44 to $23⅜ a share at a cost to Childs of $585,750. There is a dispute as to whether this stock was acquired as part of a second employees' stock purchase plan, which was drafted toward the end of September or the beginning of October, 1930, or whether it was purchased for some as yet unformulated plan. However, it is not disputed that practically none of the stock acquired in the fall and winter of 1930 was ever sold to employees.

The stock syndicate was dissolved on November 18, 1930, and the stock distributed to the participants and sub-par-

ticipants, who continued in control of Childs.

The market value of Childs common stock declined to approximately $5 a share on December 29, 1931, and thereafter to a nominal amount.

Substantially all the employees who subscribed to the Plan cancelled their subscriptions. On August 26, 1943, the date of the appointment of the plaintiff as trustee, only 130 shares had been fully paid for, and only 148 shares, all of which were in default, remained outstanding, out of the original 18,200 subscriptions.

Upon cancellation of subscriptions, Childs invariably returned to the subscribers the total amount paid by them on account of their subscriptions, and by August 26, 1943, the net amount retained by Childs by reason of employees' stock purchases was only $11,477.70.

During the time that the company spent $1,604,252.50 in acquiring its own common stock for the Plan or plans, it had available 387,388 shares of authorized but unissued shares of common stock.

The plaintiff contends that the Plan or plans were conceived, and that the stock purchases by Childs were made, pursuant to a conspiracy by the syndicate participants for the sole purpose of supporting the price of Childs common stock on the market and protecting the investment of the syndicate in the stock in total disregard of the interest of Childs and its stockholders, and not because in their honest judgment such purchases appeared to be advantageous to the company.

The fall in the price of Childs common stock in November, 1929, seriously impaired the investment of the syndicate participants and sub-participants. Purchases of stock were begun by Childs without previous authorization or even discussion of such action by the board of directors as such. A stock committee was appointed, consisting only of participants in the syndicate or their representatives, with unlimited powers to purchase Childs common stock in anticipation of an employees' stock purchase plan to be formulated by the committee. The Plan differed significantly from previous employees' stock purchase plans of Childs in that the company did not wait for the subscription of the employee but immediately purchased large amounts of stock. It also differed from the former employees' stock plans in establishing a longer period in which payment for the stock might be made and in providing that even if payment were made at an earlier time the stock would not be delivered to the subscriber until one year after the date of the subscription. These provisions would have the effect of keeping the employees' stock off the market where it might have a depressing influence on the price of the stock. The fact that some participants in the syndicate and some of their clients bought stock at the beginning of the stock purchases by Childs in 1929 and that the syndicate and some of the participants individually sold some of their stock immediately before the termination of those purchases would seem to indicate that in the opinion of the syndicate participants the purchases for the Plan would have a tendency to raise the price of Childs common stock at least temporarily and that it would be profitable to take advantage of this temporary rise in prices. These facts may be as consistent with an honest but mistaken exercise of the directors' business judgment as with a conspiracy to cause the adoption of the Plan and use the funds of Childs in order to maintain the market price of Childs stock for the benefit of the defendants.

However, it is difficult to understand why the syndicate sold 4,000 shares of its stock to Childs on February 17, 1930, at $59 a share when the market price was about $64, and why the treasurer of Childs assumed in his letter of February 4th that the syndicate would bestow this $20,000 "gift" upon Childs. The defendants have not advanced any plausible explanation for either the letter or the gift, and it would seem that they are reasonably explicable only in the light of an

understanding between the syndicate and the management of Childs that in recognition of the fact that the funds of Childs had been used to raise the market value of the stock for the benefit of the syndicate, the latter would furnish Childs all the stock it might need for the Plan at such prices that its average total cost would not exceed $56 a share.

Moreover, it is dubious that the further acquisition of stock by Childs during October, November and December of 1930, allegedly in anticipation of some future employees' stock purchase plan, was the result of honest business judgment on the part of the directors and the stock committee. The generally poor economic conditions, the decline in the business and operating income of Childs, which on December 29, 1930, compelled an announcement to the employees that their wages would have to be reduced by 10% beginning January 1, 1931, and the ever increasing number of cancellations of subscriptions and defaults in uncancelled subscriptions made it highly unlikely that any of the employees of Childs could or would participate in another employees' stock plan in the near future. Newcombe C. Baker, a partner in Laird, Bissell & Meeds and a director of Childs at that time, testified that he understood that some of the managers of Childs' restaurants were interested in acquiring Childs stock. Supposing this to have been so, there was ample stock available for these few potential purchasers, both authorized and unissued stock and stock bought for the employees' subscriptions which had been cancelled.

Nevertheless, in order to constitute fraud within the meaning of Section 48(5) of the New York Civil Practice Act there must be detrimental reliance on a knowingly false representation (see Laird v. United Shipyards, 2 Cir., 163 F.2d 12, 15; Druckerman v. Harbord, Sup., 31 N.Y.S.2d 867, 870; cf. Reno v. Bull, 226 N.Y. 546, 550, 124 N.E. 144), or, in the absence of any affirmative misrepresentation, damage resulting from concealment, with intent to defraud, of facts which one is under a duty to disclose. See Nasaba Corp. v. Harfred Realty Corp., 287 N.Y. 290, 294–295, 39 N.E.2d 243; cf. Dumbadze v. Lignante, 244 N.Y. 1, 154 N.E. 645; Lightfoot v. Davis, 198 N.Y. 261, 91 N.E. 582, 29 L.R.A.,N.S., 119.

Here, the corporate action was not taken in reliance upon any false representation on the part of the directors. Money was spent and stock was purchased without representations of any kind having been made by the defendants. Nor can it be said that the Plan was a device whereby the defendants intended to defraud Childs of its assets. The most that the evidence discloses is that the syndicate participants used the funds of Childs, to its detriment, in an unsuccessful effort to safeguard their personal investments in the stock of the company. That they were primarily motivated by selfish interests does not serve to convert what is in essence a claim for waste of corporate assets into a cause of action to procure a judgment on the ground of fraud. Since plaintiff's claim is based on waste, the Statute of Limitations began to run in 1931 when the last wrongful act was committed and is a bar to this action. Pollack v. Warner Bros. Pictures, Inc., 266 App.Div. 118, 41 N.Y S.2d 225, modifying Sup., 39 N.Y.S.2d 681.

Plaintiff contends that even though the Statute may bar an action for the original wrongful conduct, he has a "secondary" cause of action against the defendants because they induced the stockholders by means of false statements contained in certain annual reports of Childs to refrain from instituting appropriate action within the period of limitation.

It seems clear that under the New York decisions mere concealment of a cause of action by a fiduciary, without more, is not actionable. See Emmerich v. City Bank Farmers Trust Co., Sup., 83 N.Y.S.2d 840, 846, affirmed, 275 App. Div. 833, 89 N.Y.S.2d 895; American Cities Power & Light Corp. v. Williams, Sup., 74 N.Y.S.2d 369, 372–373, affirmed, 274 App.Div. 751, 80 N.Y.S.2d 357; cf. Pollack v. Warner Bros. Pictures, Inc.,

266 App.Div. 118, 41 N.Y.S.2d 225, modifying Sup., 39 N.Y.S.2d 681. In order to sustain his secondary cause of action plaintiff must prove all the elements of fraud. See American Cities Power & Light Corp. v. Williams, 189 Misc. 829, 69 N.Y.S.2d 197, 205; Druckerman v. Harbord, Sup., 31 N.Y.S.2d 867, 871. It therefore is necessary to examine the annual reports of the directors to the stockholders to determine whether they contain any false statements made with the intention to conceal from the stockholders the fact that the defendants were guilty of waste of corporate assets, and if so, whether the stockholders relied on such statements to their detriment.

In the report for the year ending December 31, 1929, there is not any mention of the Plan, which had been adopted during that year. In the preliminary statement to the stockholders, under the caption "Capital Stock", appears the statement: "The only change in the capital stock outstanding was the issuance of 274 shares of common stock in exchange for an equal amount of fractional scrip retired." At this time approximately 9,400 shares had been acquired by the corporation for resale to employees. The $500,000 expended for the acquisition of this stock were included in the single item "Other Unadjusted Debits * * $1,027,544.54" on the asset side of the balance sheet. According to uncontradicted expert testimony, it was not sound or generally accepted accounting practice at the time to include such an item under the non-disclosive caption "Other Unadjusted Debits". Plaintiff contends that these statements were intended to conceal, and did conceal, from the stockholders of the company the extent of the risk which the defendants had caused the company to take at a time when substantially no stock subscriptions had as yet been received, so as to avoid inquiry into the reasons for the stock purchases.

Whatever the effect of the statements actually may have been, it does not seem reasonable to infer that they were made with an intent to deceive. If the defendants were really determined to conceal the risk from the stockholders it hardly seems likely that they would have released a statement to the press, which was published in the New York Times on December 20, 1929, outlining the Plan and stating that Childs had already acquired stock for this purpose and that the Plan was to become effective immediately. Moreover, as of February 14, 1930, the date of the report to the stockholders, the Plan had proved to be a success. Subscriptions for 18,200 shares had been received and the market value of the stock had risen to approximately $65 a share. Under these circumstances it is difficult to believe that the directors of Childs were apprehensive lest the stockholders discover that stock purchases for the Plan had begun before the receipt of subscriptions. Since it does not appear that the directors had any plausible motive for concealment at the time, the court can not find that the statements complained of were intentionally misleading or fraudulent.

It is on the report to the stockholders for the year ending December 31, 1930, that plaintiff chiefly relies to establish his secondary cause of action. In that report the stockholders were advised of "certain developments which, in the opinion of your Board of Directors, have tended to strengthen the company both financially and from an operating standpoint." Among these developments was the fact that "In the latter part of 1929 the directors prepared a plan by which employees could become stockholders. The first offering of stock was made in January, 1930, and approximately 2,400 members of the staff subscribed to the plan. With a view to making another offering of stock to the employees at a favorable price, the company has acquired additional common stock for this purpose."

The statement that in the opinion of the directors the Plan and the purchases of stock therefor "tended to strengthen the company both financially and from an operating standpoint" was false, since it could not reasonably have been the opinion of the board of directors that the

expenditure of $1,604,252.50 on stock that at the time of the report had a market value of less than half its cost strengthened the company in any respect whatsoever.

The statement that "approximately 2,400 members of the staff subscribed to the plan" was true as far as it went, but was misleading in that it suggested that they were still subscribers to the Plan when as a matter of fact at the time of the report one-third of them had already cancelled their subscriptions or had defaulted in payments.

The balance sheet, which was part of the report to the stockholders for 1930, carried under the main heading of "Current Assets" the item "Accounts Receivable: Employees' Stock Purchases * * $529,787.28." This represented payments due from employees on their stock subscriptions. Since these payments, under the terms of the Plan, might continue for approximately 37 months, and since there was little likelihood that any substantial part of these payments would be made in view of the general economic conditions and the fact that the market price of the stock was $20.00 lower than the subscription price, it was false and misleading to list this item under the heading of "Current Assets".

Also under the heading of "Current Assets" appeared the item "Reacquired Securities (Marketable): C. Co. Common Stock (for employees at cost) $895,124.54", representing the cost of cancelled and unsubscribed stock. Although these securities were listed "at cost", the fact that they were stated to be marketable current assets would create the impression that $895,124.54 represented, at least approximately, the current value of the stock as of December 31, 1930. As a matter of fact the stock for the Plan had been acquired at a cost of approximately $56 a share and the stock during the fall of 1930 had been acquired at an average cost of approximately $32 a share. At the time of the report, however, the market value of the stock was only approximately $23 a share. The balance sheet was therefore misleading.

The false and misleading statements in the preliminary statement and in the balance sheet of the report to the stockholders for the year 1930 concealed from the stockholders the serious financial loss sustained by Childs as a result of the purchase of its own common stock. No explanation was offered for these misstatements and under the circumstances it may reasonably be inferred that they were made in order to conceal the loss from the stockholders. This in itself, however, is by no means sufficient to prove a cause of action for fraud. The plaintiff must further establish that the stockholders of Childs actually relied on the false statements in the 1930 report to their detriment. See Ziring v. Corrugated Container Corp., 183 Misc. 600, 604, 49 N.Y.S.2d 686. In this connection the defendants contend that even assuming that they intentionally concealed the losses suffered by Childs in the 1930 report, these losses were revealed to the stockholders in the reports for the years 1931 and 1932, so that the Statute of Limitations began running in 1933 at the latest and is a complete bar to this action, which was instituted in 1945.

The report for the year ending December 31, 1931, contains the following statement:

"The Balance Sheet has been adversely affected by certain necessary adjustments, as well as by unsatisfactory earnings. The current assets have been reduced * * * (by) cancellation of subscriptions under Employees' Stock Purchase Plan, which reduced 'Accounts Receivable, Employees' Stock Purchases,' by the amount of approximately $450,000."

It is not disputed that this is an accurate statement of a change in the balance sheet. However, plaintiff urges that it probably led the stockholders to believe that only $450,000 worth of subscriptions had been cancelled, whereas by December 31, 1931, the total amount of cancelled subscriptions was actually $858,536. Assuming that the statement was misleading in this respect, it would be of little moment whether the stock-

**318**

holders believed that Childs' losses were due to the wholesale cancellation of stock subscriptions or to the depreciation in value of reacquired securities for which subscriptions were never received in the first place, or to both these factors, as long as they knew, or had reason to know, the extent of the failure of the Plan or plans.

The report continues: "The current position also is made to appear less favorable by the removal of repurchased securities from current assets, which change seemed desirable on account of the great shrinkage in the market values of these securities. Referring to the Consolidated Statement of Profit and Loss and Surplus in this report, the principal adjustments to Surplus which require explanation are the writing down to stated value (i. e., the book value of outstanding stock) of 35,328 shares of Childs Company's Common Stock, orginally purchased for resale to employees and held by Childs Real Estate Company for future disposition * * *."

 Turning to the Consolidated Statement of Surplus for 1931, the stockholders would notice the following item as a deduction from surplus: "Difference between Cost and Stated Value of 35,328 shares of Common Stock * * $516,983.91". The stated value of these shares, $937,605.12, is disclosed on the asset side of the Balance Sheet under the caption "Reacquired Securities". By adding these two figures the stockholders could readily ascertain that the securities cost Childs $1,454,589.03. Since the stockholders knew, or should have known, that the market value of the stock was only $5 per share at the time, they could easily have determined that the 35,328 shares were currently worth merely $176,640, or $1,277,949.03 less than had been paid for them. The conclusion is

therefore inescapable that any concealment of the serious loss in the 1930 report was remedied by the disclosures made in the report for the following year. In view of the fact that these disclosures were made long before the Statute of Limitations had expired on the original cause of action for waste, there was not any detrimental reliance by the stockholders on the false and misleading statements contained in the earlier report. In the absence of such reliance, plaintiff has failed to prove a claim for fraud on his secondary cause of action. Moreover, even if proved, the claim would be barred by the Statute of Limitations, which started to run from the time of the disclosures in 1932.[1]

The first cause of action accordingly is dismissed as against all the defendants.

The second cause of action has been brought to recover a secret profit alleged to have been made by Empire Trust Company in connection with an issue of debentures by Childs under a trust indenture dated April 1, 1928, in violation of Empire's fiduciary duty as trustee under said indenture.

Pursuant to an underwriting agreement dated March 31, 1928, Laird, Bissell & Meeds and Tucker, Anthony & Company (hereinafter called "the Underwriting Syndicate") purchased from Childs at 92.53% of par $6,000,000 par value of debentures issued under the trust indenture. On or about April 11, 1928, Empire entered into an agreement with the Underwriting Syndicate whereby Empire committed itself to purchase $2,000,000 of said debentures at a price of 92.53% of par. Simultaneously, or shortly thereafter, the Underwriting Syndicate, with the consent of Empire, sold $1,750,000 of the face amount of Empire's $2,000,000 commitment to a

1. The statement for the year ending 1932 discloses that the reacquired stock held in Childs' treasury for employees' subscriptions had been written down to a stated value of $1.00 a share. This was equivalent to the stated value of the outstanding common stock, which had also been reduced to this value from $26.54 a share in order to create a capital surplus. The treasury stock appears on the liability side of Childs' Balance Sheet as a $37,411.00 deduction from common stock issued and outstanding.

group of bankers at 93.50% of par, resulting in a profit to Empire of $.97 per $1,000 debenture, or $16,975. This profit was applied against the price of the remaining $250,000 face amount of the debentures, which were delivered to Empire Security Company, Inc., a subsidiary of Empire.

The trust indenture expressly provided that Empire might acquire and hold debentures issued thereunder and any other securities of Childs with the same rights as it would have if it were not trustee.

In view of this provision in the trust indenture, it is difficult to understand how Empire could have been guilty of a breach of fiduciary duty in making a profit by reason of its assumption of part of the commitment of the Underwriting Syndicate. Moreover, it does not appear that Childs could have disposed of its debentures at a better price if Empire had not committed itself to purchase $2,000,000 par value of the debentures from the Underwriting Syndicate. Nor does it appear that Childs failed to receive reasonable consideration for its debentures.

The second cause of action accordingly is dismissed.

The third cause of action has been brought against defendant William A. Barber to recover a $210,000 fee which Barber's law firm received from Childs on May 4, 1928, as compensation for certain legal services rendered in connection with the so-called "Savoy-Plaza enterprise", on the ground that such fee was obtained by reason of fraudulent misrepresentations as to the nature and value of the services rendered.

Before obtaining the $210,000 in question, Barber and his firm had received fees in the amount of $165,000 from Savoy Hotel Corporation and Savoy-Plaza Corporation for legal services rendered in connection with the "Savoy-Plaza enterprise." Thereafter, on May 4, 1928, Barber's firm submitted a bill to the Board of Directors of Childs stating:

"Account of fees, commissions and expenses for services to Childs Company in the Savoy Plaza enterprise from its beginning in 1925 to April 1928, and in selling the interest of Childs Company to United States Realty and Improvement Company $210,000".

Payment of the bill was authorized and made the same day.

The question for determination is not whether $210,000 was an excessive fee under the circumstances, but whether Childs Company was induced to pay the bill by reason of fraudulent misrepresentations contained therein. Plaintiff contends that the bill falsely represented: (1) that Barber or his firm had been instrumental as brokers in effecting the sale of Childs' interest in the Savoy-Plaza Corporation to the United States Realty & Improvement Company and that it was entitled to "commissions" therefor; and (2) that vast services had been rendered by Barber or his firm in connection with the "Savoy-Plaza enterprise" from 1925 to 1928 for which no compensation had been received.

The bill does not substantiate plaintiff's contentions. While it is true that the bill uses the word "commissions," the court does not believe that the word was intended to convey the idea that Barber or his firm had acted as brokers in negotiating the sale of Childs' interest in the Savoy-Plaza Corporation. Moreover, even if the bill did contain such a representation it would not be actionable in the absence of detrimental reliance thereon by Childs, and under the circumstances it is difficult to believe that the Board of Directors of Childs would actually be deceived by a statement that Barber's law firm had rendered, and was claiming compensation for, brokerage services.

Nor is the court able to perceive that any fraudulent misrepresentations were made by Barber's firm to the stockholders of Childs in a pamphlet dated February 8, 1929, which was distributed in connection with the proxy fight between the Barber and William Childs factions. On the contrary, information contained in such pamphlet, together with a letter to

the stockholders by William Childs bearing the same date which criticized the payment of the fee to Barber's firm, put the stockholders on notice of the possibility that Barber's firm had wrongfully charged or overcharged Childs Company for their legal services. In short, all of the basic facts surrounding the alleged charge or overcharge were known, or in the exercise of reasonable diligence could have been known, by Childs Company, its officers, directors and stockholders in the spring of 1929. Thus even if plaintiff had succeeded in proving that Barber wrongfully charged or overcharged Childs Company by means of fraudulent misrepresentations the applicable Statute of Limitations, N.Y.C.P.A., § 48(5), began running in 1929 and would now bar this action. Dumbadze v. Lignonte, 244 N.Y. 1, 8–9, 154 N.E. 645; Ectore Realty Co v. Manufacturers Trust Co., 250 App. Div. 314, 294 N.Y.S. 96; Sheehan v. Municipal Light & Power Co., D.C., 54 F.Supp. 169, 175, affirmed, 2 Cir., 151 F.2d 65.

The third cause of action accordingly must also be dismissed.