# TALMADGE v. UNITED STATES SHIPPING BOARD MERCHANT FLEET CORPORATION.

## No. 423.

Circuit Court of Appeals, Second Circuit.

Aug. 29, 1933.

See, also, (C. C. A.) 63 F.(2d) 886.

George Z. Medalie, U. S. Atty., and William E. Collins, Sp. Asst. U. S. Atty., both of New York City, and Oliver P. M. Brown, Sp. Asst. U. S. Atty., of Washington, D. C., for appellant.

Delafield, Thorne & Burleigh, of New York City (Colley E. Williams, Claude A. Hope, James J. Kirwin, Jr., and Charles T. Murphy, all of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

## AUGUSTUS N. HAND, Circuit Judge.

This is an appeal by the defendant, fleet corporation, from a judgment for $885,007.09 recovered by the plaintiff, Henry P. Talmadge, suing individually and as sole surviving partner of the firm of Henry Talmadge & Co. The judgment was entered upon the verdict of a jury rendered at the second trial of this action. Upon the first trial the court directed a verdict for the defendant on the ground that there was no evidence to submit to the jury. We reversed in an opinion reported sub nomine Talmadge v. United States Shipping Board, etc. (C. C. A.) 54 F.(2d) 240.

The action was brought upon an assigned claim to recover from the fleet corporation payments made by it to the American Shipbuilding Company which it is alleged should have gone to Henry Talmadge & Co., in whose right the plaintiff herein is suing.

In June, 1917, the shipbuilding company contracted to build four ships for the fleet corporation, payment to be made as the work progressed. In September, 1917, the shipbuilding company needed financial aid in the enterprise and requested Talmadge & Co. to lend money to it as the work progressed and attempted to assign its claim to payments under the contract as security for advances to be made. No formal consent to the assignment was given by the Shipping Board, though such an assignment was requested; but one Bender, the general auditor of the board, agreed to mail to Talmadge & Co. the checks payable to the shipbuilding company and issued by the board. The checks were so mailed until April 19, 1918. There is evidence that between that time and June 1, $39,343.92 of the checks were sent by the fleet corporation to the shipbuilding company, and after June 1, checks for $530,175.68 were thus sent. These checks the shipbuilding company did not indorse over to Talmadge & Co., but converted to its own use. There was evidence that the unpaid balance of the loans made by Talmadge & Co. against these checks was $479,300. In July, 1927, Talmadge & Co. brought this action to recover for the loss of the sums so diverted to the extent of the unpaid balance of $479,300 secured by the payments under the contract. Upon the former appeal we held that the plaintiff had acquired an equitable interest in the proceeds of the diverted checks and that he was entitled to recover unless his claim was barred by the statute of limitations of the District of Columbia or by an accord and satisfaction between Talmadge & Co. and the shipping board. We said that the statute of limitations of the District of Columbia, then thought to be applicable, would only be a bar in case the members of the firm of Talmadge & Co. were nonresidents of the state of New York at the time the cause of action arose. We also said that though an accord and satisfaction had been proved it had not been pleaded as a defense and was, therefore, not a bar to the action because the plaintiff had had no day in court as to that issue. After the reversal, the defend-

ant interposed a plea of accord and satisfaction and the plaintiff, on the second trial, attempted to show that the accord was invalid because procured by fraud. Whether such was the case is the matter to be now determined. We need not consider whether the statute of limitations of the District of Columbia or of Florida, where the checks were mailed, is applicable, because the conclusion we have reached on the question of fraud renders consideration of statutes of limitation unnecessary.

The trial judge allowed the jury to pass on the issue whether the accord was procured through the fraud of Brown, the president of the American Shipbuilding Company, and its verdict was based upon a finding that it was. Appellant chiefly relies on the contention that there was no proof of fraud and that the accord was a complete bar.

The accord arose in connection with a proposed cancellation of the contract between the fleet corporation and the shipbuilding company and the making of a new contract between these corporations on a different basis. The fleet corporation was not willing to make the new contract effective until Talmadge & Co. had released its claims to all interest in payments under the original agreement, and Talmadge was notified of this fact. Accordingly, on July 26, 1918, Talmadge wrote to the fleet corporation stating that he had received no payments since July 1, asking what effect the cancellation would have on him and "what steps, if any, are required to assure that the payments will be made as agreed to our care to ourselves." On August 3, he received a reply from New, the assistant comptroller of the fleet corporation, that the matter was being investigated.

On August 9, he received a further reply from the Comptroller Bender which said:

"All payments on Contract #24 were mailed in accordance with my letter, and I have been advised by telegram by our District representative that recent payments had been made to the contractor at Brunswick at his request. You will note that my letter of October 2nd states that we have agreed to mail these checks to you at the request of the American Shipbuilding Company, and therefore, feel that they have a right to change their instructions when they so desire.

" * * * The Fleet Corporation is about to cancel Contract #24, which you are interested in, and re-negotiate the same on the basis of paying the American Shipbuilding Company actual cost of the ships; making available for this purpose an imprest fund out of which all payments are to be made. Before this can be effected, we must naturally know what liabilities are open against the contract above referred to, and I will, therefore, thank you if you will advise me to what extent your company is interested in our Contract #24 * * *."

After receipt of this letter Talmadge arranged a conference on August 14 with the Browns, who were officers and stockholders of the shipbuilding company. He testified that he inquired "what amounts were paid direct that should have come to us," and the Browns told him that the "direct payments" referred to were deductions "for lumber purposes" amounting to $6,000 and that no other payments had been made to the shipbuilder direct. This testimony of Talmadge was given fourteen years after the event, and the contention that the $6,000 paid by the fleet corporation for lumber used on the contract and, therefore, deducted from the amounts due from it thereunder, represented "the recent payments" which Bender referred to in his letter of August 9, is quite absurd. This is especially so inasmuch as Talmadge knew that the $6,000 had been deducted and admitted that the deduction was by his consent. Talmadge further said that the Browns told him "that there were very large amounts due * * * that they expected to get soon, and that the money of course would come to me directly in the usual way; that is, that they would send checks to the order of the Shipbuilding Company to my office. * * * They said there was more than enough coming in that way that would pay me in full for all my advances * * *." He added that "nothing was coming to us, nothing on the new contract at all."

Talmadge said that the Browns also told him that Bender was preparing a letter to be signed by him "releasing the contract"; that "the cancellation of the contract . * * * was merely formal and did not amount to anything at all * * * there should be no further business on that Contract 24, no further accruals, there was no moneys becoming due; that the money already due me was going to come but there would be no more money becoming due."

On August 21 the Browns presented the letter of release to the plaintiff as requested by the defendant, stating that that was the document which had been under discussion on August 14. This letter was prepared by Shackelford, assistant counsel of the fleet corporation, for signature by Henry Tal-

madge & Co. and, as signed by the latter, read as follows:

"Henry Talmadge & Co., Bankers,
52 William Street.
"New York, August 21st, 1918.
"United States Shipping Board, Emergency Fleet Corporation, Philadelphia, Pa.
"Attention Mr. D. H. Bender, comptroller.
"Gentlemen: We are advised by American Shipbuilding Company through Mr. Brown, its Vice President and General Manager, that the old contract #24 is about to be cancelled under the provisions of a new contract on a cost-plus fee basis.

"Your letter, under date of October 2nd, 1917, agreed to mail all remittances, under the old contract, payable to American Shipbuilding Company but addressed and enclosed to us.

"This is to advise you that we consent to the cancellation of the existing contract, by the new contract, in the manner above mentioned and that we do hereby release and discharge the United States Shipping Board Emergency Fleet Corporation from all liability, if any, whatsoever arising out of the cancellation of Contract #24 with the American Shipbuilding Company, in the manner above stated, and we do likewise release the said United States Shipping Board Emergency Fleet Corporation from all obligations or liability existing or that may arise on account of the letter from said Corporation to us dated October 2nd, 1917; it being our intention to release and discharge the said United States Shipping Board Emergency Fleet Corporation from all obligation, liability or responsibility to us arising out of its relations with the said American Shipbuilding Company.

"Very truly yours,
"Henry Talmadge & Co.
"8/23/18.
"O.K.   V. R. Shackelford, Asst. Counsel."

It is contended that the statements of the Browns on the 14th were the inducing cause of the signature of the above release. But the Browns, though they presented the release to Talmadge, were in no respect the agents of the fleet corporation to make representations that the "cancellation of the contract * * * was merely formal and did not amount to anything at all * * *." If, after receiving information from Bender on August 9, that "recent payments had been made to the contractor," Talmadge can be thought to have relied on statements of Brown that in effect no direct payments had been made to the contractor, that large amounts were due under the contract and would come to him "directly in the usual way," and that the cancellation of the contract was merely formal, the most that can be made out of it is a careless reliance upon the Browns and their unauthorized representation that a formal document did not mean what it said. Such an unauthorized representation, even though resulting in loss to Talmadge, could not affect the fleet corporation. Talmadge must be taken to have known that he was executing an instrument of release and that on the faith of it the fleet corporation was entering into a new contract. If all he said was accurate, the fraud of the Browns could not create an equity in favor of Talmadge that would nullify the accord where the fleet corporation had parted with a valuable consideration. It is perfectly evident that the arrangements for the new contract were not complete when Talmadge signed the letter of release and that that document was a condition of the fleet corporation's entering into the new obligation. If Talmadge's statements made years after the event be taken at their face value, they will not serve as a basis for overturning the accord.

The decision of the New York General Term in Bedell v. Bedell, 37 Hun, 419, is strongly relied on by the appellee. There a release of a husband by a wife from an obligation given by him for her was obtained through the fraud of the husband's brother. The wife sued to set aside the release and sought to prove that the release was procured through misrepresentations to her by her brother-in-law, and also that she received no consideration therefor. The trial court refused to allow proof of conversations between herself and her brother-in-law because it was not shown that he was the agent of her husband. The ruling was held error. Dykman, J., said if the evidence had been admitted "it would have shown that no consideration was paid for the agreement, that it was obtained by fraudulent representation, and that it had been accepted by the husband. Those facts entitle the plaintiff to relief on the principle that fraud vitiates all transactions into which it enters. It is not a question of agency, but a question of fraud. If the instrument in question was obtained from the plaintiff by misrepresentation and fraud it cannot be held against her. It is quite immaterial who perpetrated the fraud, the defendant cannot enjoy its results and re-

tain its benefits by a claim that it was unauthorized by him. He has accepted an instrument tainted with fraud for which he has paid no consideration."

It is perfectly true that fraud will create an equity in favor of the person defrauded, but if an innocent recipient of the fruits is not a mere donee but is a bona fide purchaser for value, the equity, as in similar cases, must yield to the legal title. In Bedell v. Bedell the husband was the beneficiary of a fraud perpetrated by his brother. He had given no consideration for the release and it might, therefore, be avoided in his hands.

We are referred to no decision that the fraud of an unauthorized agent in procuring a release will serve to avoid it if the releasee is not only innocent but has parted with a valuable consideration. The following decisions seem to be to the contrary. Law v. Grant, 37 Wis. 548; Trevitt v. Converse, 31 Ohio St. 60; Fogg v. Pew, 10 Gray (Mass.) 409, 71 Am. Dec. 662.

For the foregoing reasons the judgment is reversed.