Mary Whitney RENZ, as a beneficiary under the Charlotte P. Hyde Trust and the Nell P. Cunningham Trust and the Charlotte P. Hyde Testamentary Trust, Franklin W. Renz, as Executor under the Last Will and Testament of Mary P. Whitney who was a beneficiary under the Charlotte P. Hyde Trust and the Nell P. Cunningham Trust and the Charlotte P. Hyde Testamentary Trust, Franklin W. Renz, as Executor under the Last Will and Testament of Mary P. Whitney, and Mary Whitney Renz, derivatively and in the right and for the benefit of Finch, Pruyn & Company, Inc., Appellants,

v.

Lyman A. BEEMAN and Mary H. Beeman, Individually and as Trustees of the Charlotte P. Hyde Trust and the Nell P. Cunningham Trust, both created the 14th day of June 1954, Lyman A. Beeman, Samuel P. Hoopes, Thomas E. Meath, Lyman A. Beeman, Jr. and Elmer S. White, as Trustees of a Trust established under Agreements dated January 16, 1969, with Mary H. Beeman and Samuel P. Hoopes, Lyman A. Beeman, Mary H. Beeman and Samuel P. Hoopes as Trustees under the Charlotte P. Hyde Testamentary Trust, Mary H. Beeman and Samuel P. Hoopes as Beneficiaries under the Nell P. Cunningham Trust, Lyman A. Beeman, Individually and as Director, Chairman of the Board and Chief Executive of Finch, Pruyn & Company, Inc., Thomas E. Meath, Individually and as Director and President of Finch, Pruyn & Company, Inc., Lyman A. Beeman, Jr., Individually and as Director and Senior Vice-President of Finch, Pruyn & Company, Inc., Samuel P. Hoopes, Individually and as Director and Vice-President of Finch, Pruyn & Company, Inc., Mary H. Beeman and Elmer S. White, Individually and as Directors of Finch, Pruyn & Company, Inc., and Finch, Pruyn & Company, Inc., Appellees.

No. 915, Docket 78–7007.

United States Court of Appeals, Second Circuit.

Argued June 14, 1978.
Decided Nov. 16, 1978.

Moore, Circuit Judge, filed concurring opinion.

736

Jr., P. C., Albany, N. Y., of counsel), for appellants.

Rogers M. Doering, New York City (Thomas M. Bistline and Simpson Thacher & Bartlett, New York City, of counsel), for appellees Lyman A. Beeman and Mary H. Beeman.

Jacob H. Herzog, Albany, N. Y. (James M. Reilly and Pattison, Herzog, Sampson & Nichols, P. C., Albany, N. Y., of counsel), for appellee Lyman A. Beeman, Jr.

Warner M. Bouck, Albany, N. Y. (Bouck, Holloway & Kiernan, Albany, N. Y., of counsel), for appellee Samuel P. Hoopes.

John T. DeGraff, Jr., Albany, N. Y. (De-Graff, Foy, Conway & Holt-Harris, Albany, N. Y., of counsel), for appellee Thomas E. Meath.

Donald D. DeAngelis, Albany, N. Y. (Hinman, Straub, Pigors & Manning, Albany, N. Y., of counsel), for appellee Elmer S. White.

Before MOORE, MULLIGAN and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

This is an action based on diversity of citizenship, filed on September 24, 1974 in the District Court for the Northern District of New York (Hon. James T. Foley, Chief Judge) in which plaintiffs seek to impose a constructive trust on 2000 shares of voting preferred stock in Finch, Pruyn and Co., Inc. (Finch-Pruyn), purchased by Mary Beeman through negotiations conducted by her husband, Lyman A. Beeman, on August 8, 1962, and to remove the Beemans as trustees of certain trusts. The plaintiffs are Mary Whitney Renz, suing individually, and her husband, Franklin W. Renz, suing as executor of the estate of Mary H. Whitney, Mrs. Renz's mother. The Beemans are trustees of several *inter vivos* trusts executed simultaneously in 1954 (referred to compositely as the "1954 Trust"), under which appellant Mary Renz is now a benefi-

Arthur F. McGinn, Jr., Albany, N. Y. (Robert M. Brown and Arthur F. McGinn,

ciary. After trial on the merits, the District Court held, inter alia, that the Beemans did not breach their fiduciary duty to the plaintiffs by purchasing the Finch-Pruyn stock, and that the plaintiffs' claim is barred under New York's Statute of Limitations. We agree that the action is barred by limitations and affirm on that ground.

On the standard of fiduciary responsibility to be applied, we agree with the District Court in some respects but differ in others. To state the issues summarily, the District Court recognized that the trustees owed a general duty of undivided loyalty to the trust beneficiaries. Judge Foley found, though somewhat equivocally, that there was not enough circumstantial evidence to support a finding that the life tenants, who also had powers of appointment, had relieved the fiduciaries of their duty by consenting to the purchase of the 2000 shares. He ruled, however, that certain clauses in the trust instrument exculpated the trustees with respect to this transaction. The court, accordingly, applied the lesser standard of good faith rather than the greater standard of undivided loyalty that it might have applied in the absence of exculpation or consent.

█ Since the trial court heard the witnesses, including the parties, and assessed their credibility, we cannot say that the court's finding that Lyman Beeman and Mary Beeman acted "in good faith" was clearly erroneous, and we shall accept the conclusion as a finding of fact when we consider the statute of limitations. On the other hand, we find neither exculpation nor consent, and we are convinced that the duty of the Beemans should have been measured by the higher standard of undivided loyalty rather than good faith. We will, therefore, consider the statute of limitations from that point of view as well.

## I

To put the defense of limitations in its proper setting, we must engage in a tedious recital of the genealogy of the Pruyn family, united by blood, but estranged in later generations by competing ambitions. For over a century, the fortunes of the family have been closely tied to the business it controls. The Finch-Pruyn Co. was originally formed as a partnership in Glens Falls, New York, in 1865. Throughout its history, the company has manufactured paper products. It was incorporated in 1904, and the newly formed corporation issued 8000 shares of preferred stock and 37,500 shares of common stock. Only the preferred stock carried voting rights. Both classes of stock were divided equally between Samuel Pruyn and the Jeremiah W. Finch family. By means of purchases from the Finch family, Samuel Pruyn increased his holdings in Finch-Pruyn to a two-thirds interest.

By the terms of Samuel Pruyn's will, probated in 1909, he bequeathed remainders after his wife's life estate to his three daughters in *equal* parts, and made them *equal* residuary legatees. His 5334 shares of voting preferred stock were placed in trust, however. The trust was to be measured by the lives of Pruyn's two grandchildren, Mary Van Ness Hyde (Mrs. Mary Hyde Whitney, mother of plaintiff Mary Renz) and Samuel Pruyn Hoopes (father of defendant Samuel Hoopes, Jr.). Upon the expiration or termination of the trust, the corpus was to be distributed to the testator's "next of kin" by consanguinity. The trustees were empowered to terminate the trust at an earlier time. The trustees had the right to vote the stock and thus to control Finch-Pruyn.[1] The testator named his son-in-law, Maurice Hoopes, and a lawyer, Brown, as trustees. The survivor trustee was given the power to appoint successors, and Maurice Hoopes, in due course, named as successor trustees his daughter and son-in-law, Mary and Lyman Beeman. Lyman also became President of Finch-Pruyn in 1949. In 1954, the Beemans terminated the testamentary trust pursuant to an express power under the will.

1. The trustees were empowered to sell the preferred shares in a block, but they were restrained from selling "a part only."

If the testamentary trust had been allowed to expire only on the death of Mary Hyde Whitney (and assuming her mother, Charlotte Pruyn Hyde, and her aunt, Nell Pruyn Cunningham, died first), the corpus of Finch-Pruyn voting stock would have been divided equally between the Hoopes and Hyde families. Since Mrs. Cunningham was without issue, Mary Hoopes Beeman, Samuel Hoopes, Jr., Louis Whitney, and Mary Whitney Renz would each have received equal shares of the stock. The District Court found that when Beeman terminated the testamentary trust, *outright* ownership of the Pruyn family's voting stock in Finch-Pruyn was distributed as follows: Nell Pruyn Cunningham—1778⅔ shares; Charlotte Pruyn Hyde—1777⅔ shares; Mary Hoopes Beeman—888⅚ shares; and Samuel P. Hoopes, Jr.—888⅚ shares.[2]

Immediately thereafter Mrs. Cunningham, Mrs. Hyde and Mary Beeman made an agreement dated June 14, 1954 which created three *inter vivos* trusts in a single instrument called the 1954 Trust.[3] The new trusts held 4434⅙ shares, a *majority* of the outstanding voting shares of Finch-Pruyn. The settlors named both Lyman A. Beeman and Mary Beeman to be the trustees, though the trust provided that there shall at all times be one "disinterested trustee". It must be assumed that although Mary Beeman was a beneficiary, her husband Lyman was deemed "disinterested" enough to protect the interests of each family. The Beemans have continued as trustees until the present.[4]

The 1954 Trust grants to the trustees broad powers to vote the stock, to retain or sell trust property, to enter into various business arrangements with others on behalf of the trust property, and generally "to do all such acts, take all such proceedings, and exercise all such rights and privileges . . . as if the absolute owner thereof." The trust also contains an exculpatory clause which states that "[t]he decision of the Trustees with respect to the exercise or non-exercise by them of any discretionary power hereunder, or the time or manner of the exercise thereof, made in good faith, shall fully protect them and shall be conclusive and binding upon all persons interested in the trust estate." Lyman A. Beeman, as sole "disinterested" trustee, is given power to terminate the trust at will.

Both Mrs. Hyde and Mrs. Cunningham reserved testamentary powers of appointment under the 1954 Trust. Neither of them ever exercised that power. Mrs. Cunningham died in July 1962. Her interest in her trust devolved upon Mary Beeman, Samuel Hoopes, Jr., and Mary Hyde Whitney (plaintiff's mother), as remaindermen, each of whom received 592⅔ shares. Thus, when on August 8, 1962 Mary Beeman purchased, in a transaction to be described, 2000 additional shares, the plaintiff's mother, Mary Hyde Whitney, was *already* a direct beneficiary of the 1954 Trust.[5]

Mrs. Hyde died in 1963, and Mary Hyde Whitney, appellant Mary Renz's mother, died in 1971. Appellant then succeeded to a life interest in the corpus of both the *Hyde* and *Cunningham* Trusts.

The key triggering event for this action filed on September 24, 1974 is Mary Beeman's purchase on August 8, 1962, twelve years earlier, of 2000 additional shares of Finch-Pruyn voting preferred. Helen Finch Foulds, one of the heirs of the Finch

---

**2.** Mary and Samuel took directly because Mrs. Mary Pruyn Hoopes, the third sister, was already dead.

**3.** Mrs. Cunningham and Mrs. Hyde placed all their shares in trust; Mary Beeman placed 777⅚ shares in trust, retaining 111 shares outright. Samuel P. Hoopes, Jr., put none of his 888⅚ shares into the trust.

**4.** Elmer S. White, who was at the time an officer of Finch-Pruyn, served as substitute trustee for Mr. Beeman from 1963 to 1969. During that period Mr. Beeman traveled extensively abroad.

**5.** The Hoopes family had just acquired an edge in beneficial interests in the voting shares through Mrs. Cunningham's trust.

side of the business, died in November 1958. She bequeathed 2000 shares of voting preferred and 6300 shares of non-voting common stock to the Metropolitan Museum of Art in New York City. Shortly after probate, Metropolitan's agent, J. P. Morgan & Co., wrote to Lyman Beeman in his capacity as President of Finch-Pruyn to advise him of Metropolitan's acquisition. A series of letters was exchanged which the District Court characterized as the "initial steps toward negotiating the purchase of the Fould[s] stock." Lyman Beeman acted as negotiator for the purchase, though it is not clear on whose behalf he was negotiating.

In December 1958, only a month after Mrs. Foulds' death, Elmer White, Vice-President of Finch-Pruyn, wrote to a co-executor of the Foulds estate: "We note that the 2000 shares of preferred stock has been appraised at $120. per share and we believe that this is a realistic value. In the event this stock is placed on the market, *we* are interested in purchasing same at this price." The "we" unmistakably refers to the corporation. The letter was signed "Finch, Pruyn and Company, Incorporated, Elmer S. White, Vice-President." Nor was Mr. White in 1958 a trustee of the 1954 trusts. The record does not indicate a reply to the *corporation's* offer concerning the voting preferred shares, nor does it disclose when or to whom Mary Beeman was first proposed as a purchaser in place of the corporation.

It appears that the Metropolitan wished to sell both the voting preferred and the non-voting common stock as a single block. After 3½ years, an agreement was reached under which the Finch-Pruyn Company purchased the non-voting common stock at $140 per share and Mary Beeman purchased the voting preferred at $120 per share. The District Court determined that these prices were fair and we see no reason to disturb that finding. Lyman Beeman, who was at that time co-trustee with his wife of the 1954 Trust, acted as negotiator for both

purchases. The purchase of the common stock was approved by Finch-Pruyn's Board of Directors on August 21, 1962, but the minutes reflect neither that the 2000 shares of voting stock were also available for purchase nor that Mrs. Beeman was buying them. The shares acquired by Mrs. Beeman in these circumstances were not put into the 1954 Trust but were held by her outright. As will later be discussed, we consider the purchase by Mrs. Beeman to have been in breach of trust.

■ There are two subsequent events which appellants also contend involve breaches of fiduciary duty. First, in 1967 and 1968, Finch, Pruyn and Company's certificate of incorporation was amended; the voting preferred shares were replaced by a new Class A voting common; 2000 additional voting shares were authorized; the restriction requiring ⅔ approval for issuance or disposition of new voting stock was removed; and shareholders' preemptive rights and cumulative voting for directors were abolished. The trust shares were, of course, voted to effect these changes.[6] It is claimed that both the Beemans, as trustees, and the corporate directors breached their fiduciary duty to plaintiffs as a result of these actions. The District Court, however, found that these corporate changes were made in good faith in furtherance of corporate objectives. *See Greenbaum v. American Metal Climax, Inc.,* 27 A.D.2d 225, 231, 278 N.Y.S.2d 123 (1967); N.Y.Business Corp.Law § 717 (McKinney 1963). This finding is not clearly erroneous. The breach of trust was the 1962 purchase of the Foulds stock.

Second, more than six years after the 1962 purchase of the Foulds shares, in 1969, Mary H. Beeman and her brother, Samuel Hoopes, Jr., entered into a set of agreements referred to below as the Management Trust. Mrs. Beeman deposited into the trust the 2360 shares she held outright (including the 2000 from the Foulds pur-

---

6. The 2000 additional voting shares have not been issued.

chase) and Mr. Hoopes deposited 888⅝ shares, for a total of 3248⅝. Mrs. Beeman also agreed to exercise her testamentary power of appointment under the 1954 Trust to transfer her beneficial interest in 777⅝ shares of voting stock to the Management Trust, which, upon the exercise of her already committed power of appointment would have 4026⅔ shares, a majority of the 8000 voting shares outstanding.[7]

■ The creation of the Management Trust itself was not a breach of trust, for the brother and sister had the right to pool their interests. Without the purchase of the 2000 Foulds shares in 1962, of course, it would not have owned an absolute majority of the voting stock. Since the purchase was the only breach of trust, the statute of limitations is measured from that breach.[8]

As we mentioned at the outset, Judge Foley found it unnecessary to pass on the fiduciary obligations with respect to the Foulds stock that would be implied by the standard of undivided loyalty. In a thoughtful opinion, he appraised the termination of the testamentary trust and the simultaneous creation of the 1954 Trust as the product of a desire to extend Pruyn family control of Finch-Pruyn; and as evidence of "the confidence which the senior members of the Pruyn family placed in Lyman A. Beeman's stewardship" of the company. He found that purchase of the 2000 Foulds shares did not contravene the Beemans' duties in carrying out these purposes, because: (1) there was no attempt at concealment of the transaction; (2) although no express consent to the purchase was proven, such consent could be implied from the circumstances; and (3) the purchase was within the discretion afforded to the trustees by exculpatory language in the trust agreements.

With regard to the court's evaluation of the purposes behind the 1954 Trust, we cannot say that, as applied to the *present* generation, the finding of purpose was clearly erroneous. When the 1954 trusts were created, Beeman had already been President of Finch-Pruyn for six years and had shown his ability to run the company. We find no evidence, however, to support the conclusion that the settlors intended the Hoopes branch to control exclusively in succeeding generations, when Beeman's descendants might not be as capable of running the business, but could nevertheless refuse to yield to a competent *non-family* president.

■ The court concluded that negotiations had been conducted "with no attempt at concealment." We see no evidence to support the subsidiary finding that there were "numerous prior general discussions within the company" (if this was meant to include *directors* of the company who were not also associated with Beeman as corporate officers), but the experienced and able trial judge was in a position to weigh credibility. Though the circumstantial evidence is equivocal, we accept his assessment of credibility and let stand his finding that there was no attempt to conceal.

On the other hand, we think the finding of implied consent to the purchase by Mrs. Hyde and Mrs. Cunningham was clearly erroneous. Though the Judge did not find that there was *express* consent, he did find consent implied from the circumstances. In Judge Foley's view, this independently exonerated the Beemans from liability. *Cf.*

---

7. The Management Trust is to terminate in 1990 with the generation of Mary Beeman's grandchildren and Samuel Hoopes, Jr.'s children, or earlier in the event of the deaths of all Mary's grandchildren, by vote of three trustees.

8. This does not imply that there could never be a conflict between the interests of the Management Trust and the 1954 Trust as an independent matter. For example, if Lyman Beeman were to exercise his discretionary power to terminate the 1954 Trusts, a question might be raised whether this had been done, not in the interests of the 1954 trust beneficiaries, but to split the 1954 Trust's control, leaving the Management Trust as the sole source of the Beemans' majority control.

*Central Hanover Bank & Trust Co. v. Russell*, 290 N.Y. 593, 48 N.E.2d 704 (1943). The Judge based his holding on the following: First, he found a pattern of intra-family discussions of Finch-Pruyn Co. affairs. Second, he found a pattern of courteous and responsive treatment by Lyman Beeman of family inquiries concerning trust matters. Third, he inferred a vote of continued confidence in Lyman Beeman from the settlors' non-exercise of their testamentary powers of appointment under the 1954 Trust. Finally, the court relied on a letter from Lyman Beeman to Mary Hyde Whitney, in which the extent of Mrs. Beeman's personal holdings, including the Foulds stock, is disclosed.

■ This evidence is insufficient to support the inference of permission for the purchase that the District Court drew. Consent to self-dealing requires a more specific showing. It must be "clearly proved" and "made with a full knowledge of all the material particulars and circumstances," including the full extent of the *cestui's* legal rights. *Adair v. Brimmer*, 74 N.Y. 539, 554 (1878); *accord Matter of Ryan*, 291 N.Y. 376, 417, 52 N.E.2d 909 (1943). Accepting as proper the trial court's exclusion of evidence rendered incompetent by New York's Dead Man's Statute, N.Y.Civ.Prac.Law § 4519 (McKinney 1963 & Supp. 1978) (CPLR), we hold that the record falls short of clear proof. Neither general confidence in Lyman Beeman nor his general courtesy spell consent to personal advantage in a conflict of interest with the beneficiaries of the trust. Moreover, the letter, which we discuss in more detail when we reach the statute of limitations, though it raises other implications, is not persuasive evidence of actual consent.[9]

■ Under the higher standard of undivided loyalty, the law "stops the inquiry when the relation is disclosed, and sets aside the transaction or refuses to enforce it, at the instance of the party whom the fiduciary undertook to represent, without undertaking to deal with the question of abstract justice in the particular case." *Munson v. Syracuse, Geneva & Corning R.R.*, 103 N.Y. 58, 74, 8 N.E. 355, 358 (1886); *Wendt v. Fischer*, 243 N.Y. 439, 444, 154 N.E. 303 (1926); *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545 (1928). The main support for the District Court's application of a good faith standard instead of an "undivided loyalty" standard comes, however, from its conclusion that the trustees were permitted to engage in self-interested transactions by virtue of the *exculpatory* provisions in the 1954 trust agreement. It is true that even a trustee's duty of "utmost loyalty" can be reduced by means of language in the trust instrument permitting certain transactions involving self-interest, *O'Hayer v. de St. Aubin*, 30 A.D.2d 419, 424, 293 N.Y. S.2d 147 (1968); *Matter of Balfe*, 245 App. Div. 22, 280 N.Y.S. 128 (1935), or by express consent of the settlor, *Central Hanover Bank & Trust Co. v. Russell, supra*, 290 N.Y. at 594, 48 N.E.2d 704; *Matter of Dow*, 32 Misc.2d 415, 156 N.Y.S.2d 804 (1955), *modified on other grounds*, 3 A.D.2d 968, 162 N.Y.S.2d 196 (1957), *affirmed*, 5 N.Y.2d 739, 177 N.Y.S.2d 718, 152 N.E.2d 673 (1958). Such an exculpatory clause or agreement does reduce the standard of duty to one of good faith and permits a court to

---

**9.** Appellees also rely upon a visit by Franklin Renz to Elmer White on September 15, 1969 to show ratification by silence. Mr. Renz's visit was prompted by the urging of his mother-in-law, Mrs. Mary Hyde Whitney, who had succeeded to an interest in her own right in the 1954 Cunningham trust, to find out the status of various Charlotte P. Hyde trusts. Mr. White furnished handwritten summaries of the trust's positions. The court found that Mr. Renz was told that Mrs. Beeman owned 2270 voting shares outright, but the court also found that "[d]uring these meetings, there was no specific disclosure of Mrs. Beeman's *purchase* of the Foulds stock" (emphasis added). Franklin Renz testified that he had no knowledge of the purchase of the Foulds stock by Mrs. Beeman until his attorneys gave him that information by letter of November 2, 1972, though his attorney, as early as September 27, 1972, mentions the purchase in a letter in which he also states that he had been going over various matters with Mary and Franklin Renz.

weigh the merits of the transaction. *Matter of Balfe, supra.*

We do not agree, however, that the exculpatory clauses cited below justified a lowering of the standard of the trustee's obligation. Only the most explicit language can protect a fiduciary from liability in a conflict of interest with his *cestuis. See, e. g., Matter of Hubbell,* 302 N.Y. 246, 255, 97 N.E.2d 888 (1951). Courts may not read exculpatory language broadly, lest they unwittingly permit erosion of the fiduciary duty itself. *See Wendt v. Fischer, supra,* 243 N.Y. at 443–44, 154 N.E.2d 303.

The clauses in the agreement relied on below concern matters relating to management of the trust corpus. They give the trustees broad discretion to exercise powers and rights incident to ownership of the trust property, and we assume (though we need not decide) that they establish a good faith business judgment in the handling of trust investments. Nowhere in the agreement, however, do we find a provision granting to the trustees the right to prefer their own interests to those of the trust, or to appropriate for their own account trust opportunities. We think, rather, that the trustees were given such broad powers in managing the trust *because* there was implicit faith in their undivided loyalty. *See Matter of Durston,* 297 N.Y. 64, 71–72, 74 N.E.2d 310 (1947). That conclusion is accented by the willingness of the settlors to accept Lyman Beeman as a "disinterested" trustee who would protect *all* the beneficiaries without favoring his own wife.

The present case differs markedly from *O'Hayer v. de St. Aubin, supra.* There the trust instrument expressly stated the settlor's intent that he and his son, as trustees, should be free to profit from their trusteeships. *Id.,* 30 A.D.2d at 423–24, 293 N.Y. S.2d 147. In addition, the trust instrument expressly gave the trustees power to engage in self-dealing in the stock of the corporation whose shares comprised the corpus of the trust. *Id.* at 424, 293 N.Y.S.2d 147. *Matter of Balfe, supra,* is also differ-

ent. Under the will "the trustee was authorized to act in respect of the securities in the estate without regard to whether or not the trustee had a personal interest in these same kinds of securities or the companies to which they related." *Id.,* 245 A.D. at 24, 280 N.Y.S. at 130.

The exculpatory language involved in this case more closely resembles provisions in *Matter of Durston, supra,* which conferred power to act " 'with all the authority, and powers in connection with the same, I would possess, if living.' " The Court of Appeals held that such power is "to be exercised, however, in the manner and subject to the obligations and duties of trustees. If the testator intended that all these things could be done without regard to the fundamental rule of absolute loyalty and fidelity prohibiting any purchase or retention of securities involving a divided loyalty, the authority should have been stated." *Id.,* 297 N.Y. at 72, 74 N.E.2d at 313. We discern no express exculpation in the 1954 Trust permitting competition with the trust in the purchase of voting stock that is the core of control and comprises the *corpus* of the trust. We turn, therefore, to consider the position of the trustees without benefit of an effective exculpatory provision.

## II

In the absence of an express exculpatory clause and a lack of proof of clear consent, the central question is the obligation, under New York law, of a trustee of a family trust which controls a family corporation through ownership of a majority of the voting stock, where more than a single branch has a beneficial interest.

Absent exculpation or clear consent, it is the existence of the conflict alone that establishes the obligation. *City Bank Farmers Trust Co. v. Cannon,* 291 N.Y. 125, 132, 51 N.E.2d 674 (1943); *Matter of Van Deusen,* 37 A.D.2d 131, 133, 322 N.Y.S.2d 951 (1971); *Matter of De Planche,* 65

Misc.2d 501, 502, 318 N.Y.S.2d 194 (1971). Conflict can arise when a trustee becomes a competitor with the trust for a business opportunity. *Meinhard v. Salmon, supra; Wootten v. Wootten,* 151 F.2d 147, 150 (10th Cir. 1945), 159 F.2d 567 (10th Cir. 1947), *cert. denied,* 331 U.S. 835, 67 S.Ct. 1516, 91 L.Ed. 1848 (1947); 2 *Scott on Trusts* § 170.-21 (3d ed. 1967); *Restatement (Second) of Trusts* § 170.[10] Favoring one beneficiary over others may also be a source of conflict. *Schwartz v. Marien,* 37 N.Y.2d 487, 491, 373 N.Y.S.2d 122, 335 N.E.2d 334 (1975).

We need not consider whether purchases in smaller lots of Finch-Pruyn stock would have placed the defendants in competition with the trust. The complaint against the trustees with respect to the purchase of the Voting Preferred Stock is limited to the shares purchased on or about the 8th day of August, 1962 (erroneously described as 2277 rather than 2000 shares proved at trial). (Complaint ¶ 23). And the only constructive trust prayed for was to be imposed upon "the 2,277 shares." In the six years preceding the filing of the complaint, Mary Beeman acquired 150 shares of Class A Stock in 1972 and Lyman Beeman acquired 63 shares in 1972 and 25 shares in 1975. We will remand to the District Court to determine whether any of these shares was purchased from the Treasury of Finch-Pruyn out of either the 8,000 initially authorized shares or the 2000 additional shares authorized in 1967. If any of the shares were so acquired and without an offer to participate to the other beneficiaries of the 1954 trust, the District Court may find a breach of trust under *Schwartz v. Marien,* 37 N.Y.2d 487, 373 N.Y.S.2d 122, 335 N.E.2d 334 (1975), and if it so finds, may fashion an appropriate remedy.

As far as this appeal is concerned, we deal with only a single large purchase which could, as indeed it did, give unchallengeable control of Finch-Pruyn to the Hoopes branch for generations to come.

The absolute control of the Finch-Pruyn corporation was an asset of the trust. It is to the preservation of the joint control created by the settlors that the trustee had a fiduciary obligation. By putting the shares for control into a single basket, the settlors pledged the trustee not to disarrange the balance of control that had been created. His fiduciary obligation was enhanced because he was a member of the family whose welfare he had taken upon himself to preserve. To be sure, he had an obvious opportunity for a different conflict of interest in his position as president of the corporation and as trustee of a trust which controlled the corporate entity. But that potential conflict was known to the settlors and they were content to let Beeman serve in that dual capacity despite the remote possibility of conflict between his duties as president and as trustee. In any event, we have affirmed the finding that the apportionment of price between the corporation's purchase of the common stock and Mrs. Beeman's purchase of the preferred stock was both fair and based upon appraisal. No breach of duty can thus be inferred from his dual role. *See Matter of Kellogg,* 35 Misc.2d 541, 230 N.Y.S.2d 836 (1962); *Matter of Dow, supra,* 32 Misc.2d at 419, 156 N.Y.S.2d 804.

It is true also that the trustee never dealt with the shares which were in the corpus of the trust. In that sense Mr. Beeman may have been an exemplary trustee. But the absence of self-dealing does not measure the limit of the fiduciary obligation. The trust possessed an intangible asset which was to be free of competition from its fiduciary. An opportunity for purchase that comes to him while in a fiduciary capacity compels the trustee to give a right of first refusal to his trust estate if the opportunity fits the purpose of the trust. *Wootten v. Wootten, supra,* 151 F.2d at 150. *See Restatement (Second) of Trusts* § 170, comment k. When the trust is settled by two branches of a family, who jointly own

10. "A trustee violates his duty to the beneficiary if he enters into a substantial competition with the interest of the beneficiary." *Id.,* comment p.

control of a family company, the chancellor will insist that a trustee with ties to one branch should not disfavor the other. To upset the balance of control for selfish gain is to commit a breach of the high fiduciary duty of undivided loyalty. *See Schwartz v. Marien, supra,* 37 N.Y.2d at 491–92, 373 N.Y.S.2d 122, 335 N.E.2d 334.

Under the testamentary trust Mary Whitney Renz would have become a direct distributee free of trust restraint. At the instance of the settlors, including her mother, the dissolution and recreation of the 1954 *inter vivos* trusts reduced Mrs. Whitney to the position of a remainderman and ultimate life-tenant. As we have noted, the purpose was to keep the Beemans in charge. There is no claim of fraud or overreaching in the creation of the 1954 trust itself.

It thus appears that the plaintiff herself, who succeeded to a mere life tenancy, could never gain outright control during her lifetime of the shares of her grandmother, Mrs. Hyde, unless either Lyman Beeman terminated the 1954 Trust, or Mrs. Hyde exercised her power of appointment in favor of the plaintiff.

It could hardly be clearer that Mrs. Hyde, by failing to exercise her power of appointment before her death in 1963, did express her wish that appellant should never have voting power over the trust shares. When an opportunity came to buy Mrs. Foulds' 2000 shares from the Metropolitan Museum of Art, such a purchase by the trust, even if it had been financially able to make it, would not have enhanced appellant's position with respect to control, but would only have affected her dividends as a life-tenant of the Hyde and Cunningham trusts. To buy the 2000 shares, either the Hyde or Cunningham trust would have had to borrow on its only asset, the preferred shares in the trust. Such borrowing would hardly have been supported by the aged life-tenants, whose dividends might have been cut as a result.

Thus, while Mary Beeman was theoretically in competition with the Hyde trust when she bought the shares from the Metropolitan, she was not in practical competition with appellant herself, for appellant was locked in.

This does not take into account, however, the position of the children of Mary Whitney Renz and Louis Whitney and succeeding generations. Upon the death of appellant, her children will succeed to an outright interest in Mary Renz's shares in the Hyde and Cunningham trusts. When that happens, they will still not control the corporation. The children of Mary Renz and Louis Whitney together will own 1777⅔ shares derived from the Hyde trust and 592⅚ shares from the Cunningham trust, for a total of 2370⅚ shares. The Hoopes side without the Foulds purchase would have had 999⅚ shares directly from Mary Beeman and Samuel P. Hoopes, Jr., plus 777⅚ shares from the Mary Beeman 1954 Trust, plus 1185⅙ shares from the Cunningham trust, for a total of 2963⅓ shares. Thus, *together* the two families would command a two-thirds majority of the outstanding shares. Alone, although the Hoopes family would have had a slight edge, neither family would have had a majority of the shares.

Such a stalemate could have resulted eventually in a new trust arrangement, with each side participating in the selection of new trustees, or in the creation of a voting trust. It is this eventuality, which the 1954 Trust may be said to contemplate, that the Beemans' stock purchase eliminated. By purchase of the 2000 Foulds shares, Lyman and Mary Beeman succeeded in taking for themselves and their family absolute control of the voting stock forever. When the Management Trust terminates in 1990, the Hoopes family will continue to control to the exclusion of the Hydes by outright ownership of a majority of the voting shares. They may be able, moreover, to demand a premium for themselves if they sell their shares as a "control" block.

When the Foulds stock became available, it was the duty of Beeman, as

trustee, to notify the life-tenants, who because of their powers of appointment could have given binding consent to the purchase, *see, e. g., Central Hanover Bank & Trust Co. v. Russell, supra,* 290 N.Y. at 594, 48 N.E.2d 704; *Wootten v. Wootten, supra,* 151 F.2d at 150; *Parker v. Rogerson,* 33 A.D.2d 284, 289, 307 N.Y.S.2d 986, *appeal dismissed,* 26 N.Y.2d 964, 311 N.Y.S.2d 7, 259 N.E.2d 479 (1970); and to offer the stock to the Finch-Pruyn Company as a means of preserving the balance of control between the Hyde and Hoopes families. If the company had been willing to buy the preferred stock at what the District Court has found to be a fair price, the company purchase would have left the balance of control unaffected. There was no such offer by the trustee to Finch-Pruyn, however, and the District Court inferentially so found. If the corporation was unwilling to make the purchase, the opportunity should have been offered to the trust, or to the beneficiaries in proportion to their interest, *Wootten v. Wootten, supra,* 151 F.2d at 150. At the least, the trustees should have petitioned for court approval for Mrs. Beeman to make the purchase. *See Matter of Scarborough Properties Corp.,* 25 N.Y.2d 553, 307 N.Y.S.2d 641, 255 N.E.2d 761 (1969).[11]

We hold then, that the fiduciary duty of the Beemans was higher than that applied by the District Court. It was an obligation which was not to be measured by fairness or merit but by a standard of strict prohibition against the acts of a trustee which could disserve the future interests of some of his beneficiaries. It was, at least, the standard that would have been imposed on an independent trustee who was permitted to favor neither side.

The rule was well-stated in *Matter of Shehan,* 285 A.D. 785, 791, 141 N.Y.S.2d 439, 444 (1955):

> The duty of a trustee is easily defined because it is absolute. "The rule is inflexible that a trustee shall not place himself in a position where his interest is or may be in conflict with his duty". (*Matter of Lewisohn,* 294 N.Y. 596, 608, 63 N.E.2d 589.)

We hold that there is no exculpatory clause in this trust specific enough to dilute the rule. Nor do we find evidence to support a finding that the trust beneficiaries knew of the conflict and clearly gave their consent to Mrs. Beeman's purchase of the Foulds shares.[12] The trustees committed a breach of trust when Mary Beeman purchased the Foulds shares in 1962. On the other hand, we cannot find clearly erroneous the finding below that there was no fraudulent intent.

### III

The District Court determined as an alternative ground for its decision that the New York statute of limitations was a bar to recovery in this action which was begun on September 24, 1974. The District Court noted that if the cause of action accrued on August 1962, the date of the purchase of the Foulds shares, the statute of limitations for equitable causes of action

---

11. We cannot say that disinterested directors would necessarily have purchased the Foulds preferred stock. That would have depended on their judgment of whether the saving of dividend payments on 2000 preferred shares was worth the purchase price to be paid. But they should have been given the opportunity by the trustee, if only in the hope that the family balance of power entrusted to the trustee's care might be thus preserved.

The steps required by the trustee, if taken, would not have been purely formal gestures. By the time the actual purchase was made, Mrs. Whitney, plaintiff's mother, was already a vested beneficiary by devolution from Mrs. Cunningham, who had died a month earlier. Mrs. Whitney had expressed her concern for the welfare of her children and might well have spoken up, if given notice, either by purchasing an aliquot share or by challenging the right of Mary Beeman to buy the stock without a court proceeding.

12. Here we note the dilemma created by the Dead Man's Statute. Lyman Beeman did offer to prove that, in conversations with the deceased Mrs. Cunningham and Mrs. Hyde, he obtained their permission for his wife to purchase the 2000 shares. Judge Foley properly rejected this testimony, but in such cases a lingering doubt often remains whether the statute might not, in its application, actually subvert the objective truth.

would remain the ten-year statute, C.P.A. § 53, that was applicable before September 1, 1963, the effective date of the new CPLR. *Beresovski v. Warszawski*, 28 N.Y.2d 419, 422, 322 N.Y.S.2d 673, 271 N.E.2d 520 (1971). The court below held that even under the ten year statute the cause had been barred by limitations in August 1972, before the complaint was filed in September 1974. Since we hold that the breach of trust occurred in August 1962, the decision below must be affirmed, unless the breach itself amounted to fraud, or there was a fraudulent misrepresentation thereafter which estopped the trustee from pleading the bar of the statute.

The court found insufficient evidence to support a finding that the appellees had committed fraud. It found it unnecessary, therefore, to decide whether the complaint had been filed within two years after appellants "discovered the fraud, or could with reasonable diligence have discovered it." [13]

The court also found that the defendants were not subject to an equitable estoppel of their plea of the statute of limitations as a bar.

For reasons somewhat different from those of the District Court, we affirm Judge Foley's determination that the action is barred by the statute of limitations. We agree that the breach of trust was subject to the ten-year statute and that it ran in August 1972. We also affirm Judge Foley's ruling that there was no basis for an equitable estoppel to toll the statute.

When dealing with the statute of limitations, there is a line of cleavage not always clearly discernible between conduct which is a breach of fiduciary duty and conduct which is intentionally fraudulent. When there is a breach of fiduciary duty *without fraudulent intent*, the action in equity is governed by CPLR §§ 203(1) and 218(b) (here C.P.A. § 53), and the limitations period expires at the end of six years (here ten years) from the last act of breach—in this case in August 1972. *Erbe v. Lincoln Rochester Trust Co.*, 2 A.D.2d 242, 154 N.Y.S.2d 179 (1956), *rev'd on other grounds*, 3 N.Y.2d 321, 165 N.Y.S.2d 107, 144 N.E.2d 78 (1957).

It does not follow from the fact that the Beemans committed a breach of fiduciary duty that they were also guilty of fraud. To make a case of fraud, it would have been necessary to show that the Beemans intentionally sought to defraud the trust beneficiaries. *See Nasaba Corp. v. Harfred Realty Corp.*, 287 N.Y. 290, 294–95, 39 N.E.2d 243 (1942); *Finn v. Empire Trust Co.*, 121 F.Supp. 309, 315 (S.D.N.Y.1950). We cannot find, any more than Judge Foley did, that fraud was proved at trial by a preponderance of the evidence. Moreover, the fiduciary obligation with respect to the Foulds stock which we have stated was not obvious. Self-dealing with the trust *res*, a common form of deviation from the rule of undivided loyalty, was not involved. Authority that a trustee in this situation was required to consider the Foulds purchase as antagonistic to the trust interests was sparse. The trustee had some reason, as Judge Foley noted, to purchase the shares from the Metropolitan Museum in a preemptive move to prevent strangers, whose interests might be antagonistic to both the Whitney and Hoopes families, from getting 25% of the voting stock. And Lyman Beeman may well have thought that since control of the company was already in his hands as a trustee, the purchase of the additional shares would not upset the existing balance of power. He may not have consciously considered that this purchase would prevent future generations of the Hyde branch from participating in control of Finch-Pruyn, and that there was, therefore, a conflict of interest, calling into play the strict test of undivided loyalty. His breach of fiduciary duty, in the light of the

**13.** CPLR § 213(8) applies to "an action based upon fraud; the time within which the action must be commenced shall be computed from the time the plaintiff or the person under whom he claims discovered the fraud, or could with reasonable diligence have discovered it." The two-year time period dating from discovery is found in CPLR § 203(f).

considerations mentioned, was not, in the absence of stronger circumstantial evidence, equivalent to fraud. Hence, we must affirm the finding that fraud was not proved. Fed.R.Civ.Proc. 52(a). *United States v. National Association of Real Estate Boards*, 339 U.S. 485, 495–96, 70 S.Ct. 711, 94 L.Ed. 1007 (1950); *Nello L. Teer Co. v. Hollywood Golf Estates, Inc.*, 324 F.2d 669, 670 (5th Cir. 1963), *cert. denied*, 377 U.S. 909, 84 S.Ct. 1169, 12 L.Ed.2d 178 (1964); *Tobacco & Allied Stocks v. Transamerica Corp.*, 244 F.2d 902, 904 (3d Cir. 1957); *Beckton Dickinson & Co. v. R. P. Sherer Corp.*, 211 F.2d 835, 838 (6th Cir. 1954).[14]

The question then is whether, in the absence of fraudulent conduct by the trustee when he committed the breach of duty, he can be estopped from pleading the statute of limitations because of his conduct after the breach occurred.

Equitable estoppel is not available to toll the statute in all cases of fiduciary breach, even if there was a breach of an initial duty to disclose. *See Scheuer v. Scheuer*, 308 N.Y. 447, 126 N.E.2d 555 (1955). It is invoked, rather, when the defendant's affirmative misconduct, *after* his initial breach of duty, "produced the long delay between the accrual of the cause of action and the institution of the legal proceeding." *General Stencils, Inc. v. Chiappa*, 18 N.Y.2d 125, 128, 272 N.Y.S.2d 337, 340, 219 N.E.2d 169, 171 (1966). A common illustration of this kind of equitable estoppel arises where the plaintiff is about to institute suit and is lulled into security by promises which the defendant does not intend to fulfill but upon which the plaintiff relies, only to find that the statute has run. *See, e. g., Robinson v.*

*City of New York*, 24 A.D.2d 260, 263, 265 N.Y.S.2d 566 (1965) (agreement to stay suit). Equitable estoppel may arise when the defendant misrepresents to the plaintiff the time within which he may begin suit. *Glus v. Brooklyn Eastern District Terminal*, 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959). Equitable estoppel may also arise when affirmative fraudulent statements are made which conceal from the plaintiff facts essential to make out the cause of action. *See, e. g., Simcuski v. Saeli*, 44 N.Y.2d 442, 448–49, 406 N.Y.S.2d 259, 377 N.E.2d 713 (1978); *General Stencils, Inc. v. Chiappa, supra* (cover-up of criminal acts); *Erbe v. Lincoln Rochester Trust Co.*, 13 A.D.2d 211, 214 N.Y.S.2d 849 (1961), *appeal dismissed*, 11 N.Y.2d 754, 226 N.Y.S.2d 692, 181 N.E.2d 629 (1962) (false statement by fiduciary that it had legal right to purchase part of trust *res* ); *Dodds v. McColgan*, 229 A.D. 273, 241 N.Y.S. 584 (1930) (elaborate hoax involving false disavowal of property ownership, misrepresentation of status as executrix of defunct estate, and execution of sham settlement).[15]

On this appeal the argument for an equitable estoppel against the defendants is based principally on a letter of September 10, 1963 from Lyman Beeman to Mrs. Whitney. In that letter the extent of Mrs. Beeman's stock holdings was accurately disclosed, but there was no allusion to the source of her stock ownership. Mr. Beeman wrote to Mary Hyde Whitney (plaintiff's mother), who had inquired after the death of her mother, Charlotte Hyde, about the voting control of Finch-Pruyn, as follows:

> [T]he control was in the Preferred stock and concentrates mainly in the Trust set

**14.** Though we do not find fraudulent conduct on the part of the defendants, we would hold, in any event, that "reasonable diligence" should have discovered the fraud more than two years before the complaint was filed. CPLR § 203(f); *see Rutland House Assoc. v. Danoff*, 37 A.D.2d 828, 325 N.Y.S.2d 273 (1971); *Hoff Research & Dev. Labs, Inc. v. Philippine Nat'l Bank*, 426 F.2d 1023, 1025–27 (2d Cir. 1970).

**15.** Many cases of this kind come up on motions to dismiss the complaint, and some of the lan-

guage of the opinions simply reflects the strong feeling of appellate courts that the plaintiff should prevail against summary dismissal, if on *any* set of facts he might prevail at trial. *E. g., Dupuis v. Van Natten*, 61 A.D.2d 293, 402 N.Y.S.2d 242 (1978); *Quadrozzi Concrete Corp. v. Mastroianni*, 56 A.D.2d 353, 392 N.Y.S.2d 687, *appeal dismissed*, 42 N.Y.2d 824 (1977); *Robinson v. City of New York, supra; Erbe v. Lincoln Rochester Trust Co., supra.*

up originally under the will of Samuel Pruyn, which has been changed to some extent but still controls over 50% of the stock. Polly [Mary Beeman] and Elmer White are trustees of this Trust *and in addition Polly owns outright about 30%.* This control has been in the hands of Maurice Hoopes, your father and Polly pretty much through the 50 years of its existence (italics supplied).

The letter ended: *"There may be other things you want to know and I will be happy to try to answer any questions you have to ask."*

The letter might, indeed, have created the impression on strangers that Mary Beeman had held 30% of the voting stock for a long time, and that all her shares had been obtained by inheritance. But it is by no means clear that the intent was to conceal, particularly in the light of Beeman's invitation for further inquiry. Judge Foley found that there was no intentional concealment of the purchase. As an appellate court, we cannot say that the finding of Judge Foley, a judge of great experience in assessing credibility, that there was no intent to conceal was clearly erroneous. Fed. R.Civ.Proc. 52(a).

Though the lack of affirmative acts of concealment amounting to fraud is enough to defeat the claim that the statute of limitations was tolled by an equitable estoppel, we must note also that enough was stated to require the appellants, in the circumstances, to pursue further inquiry with diligence. The letter on its face reveals enough to have elicited a further inquiry from Mrs. Whitney of how Mrs. Beeman managed to get 30% of the voting stock "outright."

Appellants and their predecessors had access to the will of Samuel Pruyn, knew the terms of the trust created by that will, and had or could easily get the instrument creating the 1954 trusts. They also knew about the shares which devolved upon the death of Mrs. Cunningham in July 1962. From these documents it was simple enough to calculate Mrs. Beeman's total holding derived by inheritance. Comparison of that figure with the figure of 30% outside the 1954 trust in the 1963 letter would have indicated that Mary must have acquired a considerable number of shares by methods other than inheritance. It was reasonable to assume that persons who, as Judge Foley found, had initiated inquiry into the voting control of the company, and who, as Mrs. Whitney's letters to her mother indicate, had expressed suspicion of the motives of Mrs. Beeman, would make such a simple computation from materials available or easily obtained. Once this basic fact was known, an inquiry, as was in fact later made by the Renz lawyer, would have elicited the facts concerning the Foulds purchase. There is no indication that a request to see the shareholders' list would have been refused. *See* N.Y.Business Corp.Law § 624 (McKinney 1963 & Supp.1977). The stock ledger showed the transfer to Mary Beeman of 2000 shares on August 13, 1962.

When plaintiffs possess "timely knowledge" sufficient to place them "under a duty to make inquiry and ascertain for themselves all the relevant facts," courts should "not view with favor a claim of estoppel grounded in fraud." *Augstein v. Levey,* 3 A.D.2d 595, 598, 162 N.Y.S.2d 269, 273 (1957), *affirmed,* 4 N.Y.2d 791, 173 N.Y. S.2d 27, 149 N.E.2d 528 (1958). All that is needed to commence the running of the statute is "knowledge of facts sufficient 'to suggest to a person of ordinary intelligence the probability that he has been defrauded.'" *Sielcken-Schwarz v. American Factors, Ltd.,* 265 N.Y. 239, 246, 192 N.E. 307, 310 (1934) (quoting *Higgins v. Crouse,* 147 N.Y. 411, 416, 42 N.E. 6, 7 (1895)). This court has consistently adhered to that view when applying New York law. *See, e. g., Klein v. Bower,* 421 F.2d 338, 343–44 (2d Cir. 1970); *Talmadge v. United States Shipping Board,* 54 F.2d 240, 243 (2d Cir. 1931), *on remand,* 66 F.2d 773 (1933), *cert. denied,* 291 U.S. 669, 54 S.Ct. 454, 78 L.Ed. 1059 (1934). We think that the test for timely knowledge under the doctrine of equitable estoppel is similar to that set forth with regard to fraud in CPLR § 213(8)—"could

with reasonable diligence have discovered it."

We must hold, therefore, that since appellants were told on September 10, 1963 the extent of Mary Beeman's holding and could have easily discovered that she could not own so many shares by inheritance alone, they were in a position by simple inquiry to discover the details of the Foulds purchase. In these circumstances, the statute of limitations was not tolled.

Appellants also suggest that there was enough ambiguity in the conversations held in 1969 between Franklin Renz and Elmer White to make a case of fraudulent concealment. See footnote 9. Renz, Mrs. Whitney's representative, inquired generally concerning the status of family stock holdings. He was told the true extent of Mary Beeman's ownership, but he did not ask how she acquired her shares. White, treasurer of Finch-Pruyn, did not volunteer that it was in part derived from the Foulds stock purchase. Renz failed to make further inquiry. That he failed to ask the proper questions and succeeded only in discovering what had already been discovered in the 1963 letter was not enough to bar the statute of limitations defense.

We conclude that Judge Foley was right in his determination that the statute of limitations barred the action. We accordingly affirm his dismissal of the complaint on that ground, costs to appellee.

With respect to allegations against the other corporate directors, the statute of limitations has surely run. The plaintiffs have withdrawn their derivative causes of action, and the directors have not been shown to have engaged in any kind of concealment at the time of the purchase by Mrs. Beeman, or between 1962 and 1972 when the statute for acts committed in breach of trust by the Beemans had run.

The participation of some of the directors in the Management Trust set up in 1969 did not create a new cause of action, and Judge Foley so found. In our view, the creation of the Management Trust itself involved no breach of duty. The purchase of the 2000 Foulds shares which went into the Management Trust was the heart of the fiduciary problem, and the purchase itself is barred as a claim for relief.

The dismissal of the complaint is affirmed except with respect to the putative transactions held to be not barred by the statute of limitations. Accordingly, the present judgment of dismissal is vacated for further proceedings in accordance with the opinion.

MOORE, Circuit Judge (concurring):

I concur in Judge Gurfein's opinion that the statute of limitations bars this action. In addition to the reasons (and facts in support thereof), so convincing of notice, I would merely note that from the moment of the press announcement of Mrs. Foulds' death in 1958 and her bequest of F–P stock to the Met, the question of its ultimate disposition must have been uppermost in the minds of every member of the Pruyn lineage. Therefore, although the letter of September 10, 1963 gave a direct statement of Mary Beeman's holdings, the question must have been considered and undoubtedly discussed in family circles, namely: I wonder whatever happened to the Foulds' stock?

I differ with Judge Gurfein's opinion as to the fiduciary-trustee issue on his application of the law to the facts or possibly better the facts to the law. I agree that the highest standards of trust loyalty should apply but I am equally mindful of Justice (then Chief Judge) Cardozo's precept in Meinhard v. Salmon, 249 N.Y. 458 at 466, 164 N.E. 545, at 547 (1928): "Little profit will come from a dissection of the precedents". Decision in each case must rest on its own facts.

I do not place any reliance upon the exculpatory clause. On the other hand I see no justifiable reason for Lyman Beeman to have used F–P assets to purchase a preferred stock for the company when it had no business reason for so doing. To me the reasons for not buying the stock for the Trust are equally clear. It had no assets

with which to make the purchase. To have borrowed the money for the purchase, pledging F–P stock, might well have been a breach of trust had the beneficiaries chosen to complain that their interests were adversely affected thereby.

In short, Judge Foley heard all witnesses called by plaintiffs, found that there was no proof of corporate mismanagement, and no fraudulent concealment of Mrs. Beeman's stock purchase. To the contrary he found the fair inferences to be otherwise. Upon the law and the facts, I would affirm Judge Foley's decision in its entirety with the comment that some significance adverse to plaintiffs attaches in my opinion to the making of the serious type of charges set forth in causes of action Fourth, Eighth and Ninth as well as Sixth and Seventh (derivative) and then withdrawing them without tendering any proof thereon.